**THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF IOWA**

| | |
|---|---|
| In re MercyOne Data Breach Litigation | Case No. 4:23-cv-00195-SHL-SBJ |
| | **JURY TRIAL DEMANDED** |

## CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Tiffany Harris, Jennifer Medenblik, Rebecca Oberdorf, Michael Prins, and Jeremy Shine ("Plaintiffs"), individually and on behalf of all similarly situated persons, allege the following against Mercy Health Network, Inc. and Mercy Medical Center – Clinton, Inc. (collectively, "MercyOne" or "Defendants") based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation by Plaintiffs' counsel and review of public documents as to all other matters:

## I.    INTRODUCTION

1.    Plaintiffs bring this class action against MercyOne for its failure to properly secure and safeguard Plaintiffs' and other similarly situated MercyOne patients' personally identifiable information ("PII") and protected health information ("PHI"), including name, address, date of birth, driver's license/state identification number, Social Security number, financial account information, medical record number, encounter number, Medicare or Medicaid identification number, mental or physical treatment/condition information, diagnosis code/information, date of service, admission/discharge date, prescription information, billing/claims information, personal representative or guardian name, and health insurance information (the "Private Information"), from criminal hackers.

2. MercyOne, based in Des Moines, Iowa, is "an integrated system of hospitals, clinics and other health care facilities[,]" with "more than 2,000 physicians and advanced practice clinicians, across 18 medical centers and 23 affiliated organizations with nearly 18,000 colleagues[.]"[1]

3. On or about June 2, 2023, MercyOne sent out data breach notice letters (the "Notice") to individuals whose Private Information was compromised as a result of the hacking incident.

4. According to the Notice, unusual activity was detected on Defendants' network that disrupted certain systems and, in response, Defendants launched an investigation that revealed an unauthorized party had access to certain files containing sensitive patient information, and such access took place between March 7, 2023, and April 4, 2023 (the "Data Breach").

5. Plaintiffs and "Class Members" (defined below) were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm. The risk will remain for their respective lifetimes.

6. The Private Information compromised in the Data Breach contained highly sensitive patient data, representing a gold mine for data thieves.

7. Armed with the Private Information accessed in the Data Breach (and a head start), data thieves can commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' names to obtain medical services, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class

---

[1] *See* https://www.mercyone.org/about-us/ (last visited on June 11, 2023).

Members' names but with another person's photograph, and giving false information to police during an arrest.

8.      There has been no assurance offered by MercyOne that all personal data or copies of data have been recovered or destroyed, or that Defendants have adequately enhanced their data security practices sufficient to avoid a similar breach of its network in the future.

9.      Therefore, Plaintiffs and Class Members have suffered and are at an imminent, immediate, and continuing increased risk of suffering, ascertainable losses in the form of harm from identity theft and other fraudulent misuse of their Private Information, the loss of the benefit of their bargain, out-of-pocket expenses incurred to remedy or mitigate the effects of the Data Breach, and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

10.     Plaintiffs bring this class action lawsuit to address MercyOne's inadequate safeguarding of Class Members' Private Information that it collected and maintained.

11.     The potential for improper disclosure and theft of Plaintiffs' and Class Members' Private Information was a known risk to MercyOne, and thus MercyOne was on notice that failing to take necessary steps to secure the Private Information left it vulnerable to an attack.

12.     Upon information and belief, MercyOne and its employees failed to properly implement security practices with regard to the computer network and systems that housed the Private Information. Had MercyOne properly monitored its networks, it would have discovered the Data Breach sooner.

13.     Plaintiffs' and Class Members' identities are now at risk because of MercyOne's negligent conduct as the Private Information that MercyOne collected and maintained is now in the hands of data thieves and other unauthorized third parties.

14.     Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed and/or compromised during the Data Breach.

15.     Accordingly, Plaintiffs, on behalf of themselves and the Class, assert claims for (1) negligence, (2) negligence per se, (3) breach of contract, (4) breach of implied contract, (5) unjust enrichment, (6) breach of confidence, (7) breach of fiduciary duty, and (8) declaratory judgement.

## II.     PARTIES

16.     Plaintiff Tiffany Harris is, and at all times mentioned herein was, an individual citizen of the State of Iowa.

17.     Plaintiff Jennifer Medenblik is, and at all times mentioned herein was, an individual citizen of the State of Illinois.

18.     Plaintiff Rebecca Oberdorf is, and at all times mentioned herein was, an individual citizen of the State of Iowa.

19.     Plaintiff Michael Prins is, and at all times mentioned herein was, an individual citizen of the State of Iowa.

20.     Plaintiff Jeremy Shine is, and at all times mentioned herein was, an individual citizen of the State of Iowa.

21.     Defendant MercyOne Health Network, Inc. is incorporated in Delaware, with its principal place of business located at 1449 NW 128th Street, Bldg. 5, Suite 200 in Clive, Iowa, Polk County.

22.     Defendant Mercy Medical Center – Clinton, Inc. is incorporated in Delaware, with its principal place of business located at 1410 North Fourth Street, Clinton, IA, Clinton County.

## III.    JURISDICTION AND VENUE

23.    The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332 (d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of class members is over 100, many of whom have different citizenship from MercyOne. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

24.    This Court has jurisdiction over Defendants because Defendants operate in and/or are incorporated in this District.

25.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District and MercyOne has harmed Class Members residing in this District.

## IV.    FACTUAL ALLEGATIONS

### A.  *MercyOne's Business and Collection of Plaintiffs' and Class Members' Private Information*

26.    MercyOne, based in Des Moines, Iowa, is an integrated system of hospitals, clinics and other health care facilities, with more than 2,000 physicians and advanced practice clinicians, across 18 medical centers and 23 affiliated organizations with nearly 18,000 colleagues.

27.    As a condition of receiving health-related services, MercyOne requires that its patients entrust it with highly sensitive personal and health information. In the ordinary course of receiving service from MercyOne, Plaintiffs and Class Members were required to provide their Private Information to Defendants.

28.    In its HIPAA Policy found on its website, MercyOne states its commitment to "protecting the privacy of your health information and records[,]" adding that "MercyOne employees will not disclose any of the information contained in your medical records to anyone

other than those involved in your care including family caregivers unless you have given us advance written permission."[2]

29.     Notably, all patients receive a "Notice of Privacy Practices" when they check into a MercyOne location.[3]

30.     Thus, due to the highly sensitive and personal nature of the information MercyOne acquires and stores with respect to its patients, MercyOne promises to, among other things: keep patients' Private Information private; comply with industry standards related to data security and the maintenance of its patients' Private Information; inform its patients of its legal duties relating to data security and comply with all federal and state laws protecting patients' Private Information; only use and release patients' Private Information for reasons that relate to the services it provides; and provide adequate notice to patients if their Private Information is disclosed without authorization.

31.     By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, MercyOne assumed legal and equitable duties it owed to them and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' Private Information from unauthorized disclosure and exfiltration.

32.     Plaintiffs and Class Members relied on MercyOne to keep their Private Information confidential and securely maintained and to only make authorized disclosures of this Private Information, which Defendants ultimately failed to do.

---

[2] *See* https://www.mercyone.org/for-patients/hipaa-policy (last visited June 11, 2023).

[3] *Id*.

**B.   *The Data Breach and Defendants' Inadequate Notice to Plaintiffs and Class Members***

33.     According to Defendants' Notice, it learned of unauthorized access to its computer systems on April 4, 2023, with such unauthorized access having taken place between March 7, 2023, and April 4, 2023.

34.     Through the Data Breach, the unauthorized cybercriminal(s) accessed a cache of highly sensitive Private Information, including Plaintiffs' and Class Members' Social Security numbers and PHI.

35.     In or around early June of 2023, MercyOne delivered its Notice to Plaintiffs and Class Members, alerting them that their highly sensitive Private Information had been exposed in a "recent incident."

36.     Defendant's Notice letter then listed generic and time-consuming steps that victims of data security incidents can take, such as getting a copy of a credit report or notifying law enforcement about suspicious financial account activity. Other than providing limited credit monitoring that Plaintiffs and Class Members would have to affirmatively sign up for, and a call center number that victims could contact, MercyOne offered no other substantive steps to help victims like Plaintiffs and Class Members to remediate the harms done to them. On information and belief, MercyOne sent a similar generic letter to all other individuals affected by the Data Breach.

37.     MercyOne had obligations created by contract, industry standards, common law, and representations made to Plaintiffs and Class Members to keep Plaintiffs' and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

38.     Plaintiffs and Class Members provided their Private Information to MercyOne with the reasonable expectation and mutual understanding that MercyOne would comply with its

obligations to keep such Information confidential and secure from unauthorized access and to provide timely notice of any security breaches.

39.     MercyOne's data security obligations were particularly important given the substantial increase in cyberattacks in recent years.

40.     MercyOne knew or should have known that its electronic records would be targeted by cybercriminals.

### C.  The Healthcare Sector is Particularly Susceptible to Data Breaches

41.     MercyOne was on notice that companies in the healthcare industry are susceptible targets for data breaches.

42.     MercyOne was also on notice that the FBI has been concerned about data security in the healthcare industry. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."[4]

43.     The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of

---

[4] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, Reuters (Aug. 2014), *available at* https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820 (last visited on June 11, 2023).

patients' health and financial information, but also patient access to care.[5]

44.     The healthcare sector reported the second largest number of data breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[6] In 2022, the largest growth in compromises occurred in the healthcare sector.[7]

45.     Indeed, when compromised, healthcare-related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident … came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[8]

46.     Almost 50 percent of the victims of identity theft lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at all. Data

---

[5] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, Am. Med. Ass'n. (Oct. 4, 2019), *available at*: https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals (last visited on June 11, 2023).

[6] Identity Theft Resource Center, *2018 End-of-Year Data Breach Report, available at*: https://www.idtheftcenter.org/2018-data-breaches/ (last visited on June 11, 2023).

[7] Identity Theft Resource Center, *2022 End-of-Yeare Data Breach Report, available at*: https://www.idtheftcenter.org/wp-content/uploads/2023/01/ITRC_2022-Data-Breach-Report_Final-1.pdf (last visited on June 11, 2023).

[8] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), *available at:* https://www.cnet.com/news/privacy/study-medical-identity-theft-is-costly-for-victims/ (last visited on June 11, 2023).

breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[9]

47.     Healthcare-related breaches have continued to rapidly increase because electronic patient data is seen as a valuable asset. "Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies, to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[10]

48.     As a healthcare provider, MercyOne knew, or should have known, the importance of safeguarding its patients' Private Information, including PHI, entrusted to it, and of the foreseeable consequences if such data were to be disclosed. These consequences include the significant costs that would be imposed on MercyOne's patients as a result of a breach. MercyOne failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

**D.  The Data Breach was Foreseeable and Preventable**

49.     As explained by the FBI, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[11]

50.     Defendants' data security obligations were particularly important given the

---

[9] *Id.*

[10] Inside Digital Health, *How to Safeguard Hospital Data from Email Spoofing Attacks*, April 4, 2019, *available at*: https://www.chiefhealthcareexecutive.com/view/how-to-safeguard-hospital-data-from-email-spoofing-attacks (last visited on June 11, 2023).

[11] *See* How to Protect Your Networks from RANSOMWARE, at 3, *available at* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last accessed May 17, 2023).

substantial increase in cyberattacks and/or data breaches in the healthcare industry preceding the date of the breach.

51.   In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed.[12]  In 2022, there was a 41.5% increase in the number of victims impacted.[13] Of the 1,862 recorded data breaches in 2021, 330 of them, or 17.7% were in the medical or healthcare industry. The 330 reported breaches in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.

52.   Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack.[14]

53.   In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks in the past year.[15]

54.   Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendants' industry, including Defendants.

55.   To prevent and detect cyber-attacks Defendants could and should have

---

[12] See *Identity Theft Resource Center's 2021 Annual Data Breach Report Sets New Record for Number of Compromises,* https://www.idtheftcenter.org/post/identity-theft-resource-center-2021-annual-data-breach-report-sets-new-record-for-number-of-compromises/?utm_source=press+release&utm_medium=website&utm_campaign=2022+Annual+Data+Breach+Report.

[13] *Identity Theft Resource Center's 2022 Annual Data Breach Report Reveals Near-Record Number of Compromises,* https://www.idtheftcenter.org/post/2022-annual-data-breach-report-reveals-near-record-number-compromises/

[14] FBI, Secret Service Warn of Targeted, Law360 (Nov.18,2019), https://www.law360.com/articles/1220974/fbisecret-service-warn-of-targeted-ransomware.

implemented, as recommended by the United States Cybersecurity & Infrastructure Security

Agency, the following measures:

- **Update and patch your computer**. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks ....

- **Use caution with links and when entering website addresses.** Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net) ....

- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe.** Check a website's security to ensure the information you submit is encrypted before you provide it ....

- **Verify email senders**. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself**. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters-and keep them updated-to reduce malicious network traffic ....[16]

56.     To prevent and detect cyber-attacks or ransomware attacks Defendants could and

should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team,

---

[16] *See* ST 19-001:Protecting Against Ransomware (original release date Apr. 11, 2019), *available at https://readiness255.rssing.com/chan-9268821/all_p83.html*

the following measures:

- **Secure internet-facing assets**

    o  Apply latest security updates
    o  Use threat and vulnerability management
    o  Perform regular audit; remove privileged credentials;

- **Thoroughly investigate and remediate alerts**

    o  Prioritize and treat commodity malware infections as potential full compromise;

- **Include IT Pros in security discussions**

    o  Ensure collaboration among (security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

- **Build credential hygiene**

    o  Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

- **Apply principle of least-privilege**

    o  Monitor for adversarial activities
    o  Hunt for brute force attempts
    o  Monitor for cleanup of Event Logs
    o  Analyze logon events;

- **Harden infrastructure**

    o  Use Windows Defender Firewall
    o  Enable tamper protection
    o  Enable cloud-delivered protection
    o  Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[17]

---

[17] *Human-operated ransomware attacks: A preventable disaster,* https://www.microsoft.com/ en-us/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster

### E. *MercyOne Failed to Comply with HIPAA*

57.     Title II of HIPAA contains what are known as the Administrative Simplification provisions. *See* 42 U.S.C. §§ 1301, *et seq*. These provisions require that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling PHI similar to the data Defendants left unguarded and vulnerable to attack. HHS has subsequently promulgated five rules under authority of the Administrative Simplification provisions of HIPAA.

58.     MercyOne's Data Breach resulted from a combination of insufficiencies that indicate MercyOne failed to comply with safeguards mandated by HIPAA regulations and industry standards. First, it can be inferred from MercyOne's Data Breach that MercyOne either failed to implement, or inadequately implemented, information security policies or procedures to protect Plaintiffs' and Class Members' PHI.

59.     Plaintiffs' and Class Members' Private Information compromised in the Data Breach included "protected health information" as defined by CFR § 160.103.

60.     45 CFR § 164.402 defines "breach" as "the acquisition, access, use, or disclosure of protected health information in a manner not permitted under subpart E of this part which compromises the security or privacy of the protected health information."

61.     45 CFR § 164.402 also defines "unsecured protected health information" as "protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons through the use of a technology or methodology specified by the [HHS] Secretary[.]"

62.     Plaintiffs' and Class Members' Private Information included "unsecured protected health information" as defined by 45 CFR § 164.402.

14

63.     Based upon Defendants' Notice to Plaintiffs and Class Members, MercyOne reasonably believes that Plaintiffs' and Class Members' unsecured PHI has been acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E, as a result of the Data Breach.

64.     Plaintiffs' and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

65.     Plaintiffs' and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

66.     Plaintiffs' and Class Members' unsecured PHI was viewed by unauthorized persons in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach.

67.     After receiving notice that they were victims of the Data Breach (which required the filing of a data breach report in accordance with 45 CFR § 164.408(a)), it is reasonable for recipients of that notice, including Plaintiffs and Class Members in this case, to believe that future harm (including medical identity theft) is real and imminent, and to take steps necessary to mitigate that risk of future harm.

68.     In addition, MercyOne's Data Breach could have been prevented if MercyOne had implemented HIPAA-mandated, industry standard policies and procedures for securely disposing of PHI when it was no longer necessary and/or had honored its obligations to its patients.

69.     MercyOne's security failures also include, but are not limited to:

    a.  Failing to maintain an adequate data security system to prevent data loss;

b.  Failing to mitigate the risks of a data breach and loss of data;

c.  Failing to ensure the confidentiality and integrity of electronic protected health information MercyOne creates, receives, maintains, and transmits in violation of 45 CFR 164.306(a)(1);

d.  Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 CFR 164.312(a)(1);

e.  Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 CFR 164.308(a)(1);

f.  Failing to identify and respond to suspected or known security incidents;

g.  Failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 CFR 164.308(a)(6)(ii);

h.  Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information, in violation of 45 CFR 164.306(a)(2);

i.  Failing to protect against any reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 CFR 164.306(a)(3);

j.  Failing to ensure compliance with HIPAA security standard rules by Defendants' workforce, in violation of 45 CFR 164.306(a)(94); and

    k.   Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons, in violation of 45 CFR 164.502, *et seq.*

70.    Because MercyOne has failed to comply with HIPAA, while monetary relief may cure some of Plaintiffs' and Class Members' injuries, injunctive relief is also necessary to ensure MercyOne's approach to information security is adequate and appropriate going forward. MercyOne still maintains the PHI and other highly sensitive PII of its current and former patients, including Plaintiffs and Class Members. Without the supervision of the Court through injunctive relief, Plaintiffs' and Class Members' Private Information remains at risk of subsequent data breaches.

### F.  MercyOne Failed to Comply with FTC Guidelines

71.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses to highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

72.    In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct

any security problems. The guidelines also recommend businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

73.     The FTC further recommends companies not maintain PII, which includes PHI, longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

74.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

75.     As evidenced by the Data Breach, MercyOne failed to properly implement basic data security practices. MercyOne's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

76.     MercyOne was at all times fully aware of its obligation to protect the Private Information of its patients yet failed to comply with such obligations. Defendants were also aware of the significant repercussions that would result from its failure to do so.

### G.  *MercyOne Failed to Comply with Industry Standards*

77.     As noted above, experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

78.     Some industry best practices that should be implemented by businesses dealing with sensitive PHI like MercyOne include but are not limited to: educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, and limiting which employees can access sensitive data. As evidenced by the Data Breach, Defendants failed to follow some or all of these industry best practices.

79.     Other best cybersecurity practices that are standard in the industry include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points. As evidenced by the Data Breach, Defendants failed to follow some or all of these cybersecurity best practices.

80.     Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

81. Defendants failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

**H. MercyOne Breached its Duty to Safeguard Plaintiffs' and Class Members' Private Information**

82. In addition to its obligations under federal and state laws, MercyOne owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. MercyOne owed a duty to Plaintiffs and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of Class Members

83. MercyOne breached its obligations to Plaintiffs and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data. MercyOne's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

   a. Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

   b. Failing to adequately protect patients' Private Information;

   c. Failing to properly monitor its own data security systems for existing intrusions;

   d. Failing to sufficiently train its employees regarding the proper handling of its patients Private Information;

   e. Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA;

      f.    Failing to adhere to HIPAA and industry standards for cybersecurity as discussed above; and

      g.    Otherwise breaching its duties and obligations to protect Plaintiffs' and Class Members' Private Information.

84.    MercyOne negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Private Information by allowing cyberthieves to access its computer network and systems which contained unsecured and unencrypted Private Information.

85.    Had MercyOne remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, it could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiffs' and Class Members' confidential Private Information.

86.    Accordingly, Plaintiffs' and Class Members' lives were severely disrupted. What's more, they have been harmed as a result of the Data Breach and now face an increased risk of future harm that includes, but is not limited to, fraud and identity theft. Plaintiffs and Class Members also lost the benefit of the bargain they made with MercyOne.

## I.   *MercyOne Should Have Known that Cybercriminals Target PII and PHI to Carry Out Fraud and Identity Theft*

87.    The FTC hosted a workshop to discuss "informational injuries," which are injuries that consumers like Plaintiffs and Class Members suffer from privacy and security incidents such as data breaches or unauthorized disclosure of data.[18] Exposure of highly sensitive personal

---

[18] *FTC Information Injury Workshop, BE and BCP Staff Perspective,* Federal Trade Commission, (October 2018), *available at* https://www.ftc.gov/system/files/documents/reports/ftc-informational-injury-workshop-be-bcp-staff-perspective/informational_injury_workshop_staff_report_-_oct_2018_0.pdf (last visited on June 11, 2023).

information that a consumer wishes to keep private may cause harm to the consumer, such as the ability to obtain or keep employment. Consumers' loss of trust in e-commerce also deprives them of the benefits provided by the full range of goods and services available which can have negative impacts on daily life.

88.     Any victim of a data breach is exposed to serious ramifications regardless of the nature of the data that was breached. Indeed, the reason why criminals steal information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims or to take over victims' identities in order to engage in illegal financial transactions under the victims' names.

89.     Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity or to otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

90.     In fact, as technology advances, computer programs may scan the Internet with a wider scope to create a mosaic of information that may be used to link compromised information to an individual in ways that were not previously possible. This is known as the "mosaic effect." Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts.

91.     Thus, even if certain information was not purportedly involved in the Data Breach, the unauthorized parties could use Plaintiffs' and Class Members' Private Information to access accounts, including, but not limited to, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiffs and Class Members.

92.     For these reasons, the FTC recommends that identity theft victims take several time-consuming steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert on their account (and an extended fraud alert that lasts for 7 years if someone steals the victim's identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a freeze on their credit, and correcting their credit reports.[19] However, these steps do not guarantee protection from identity theft but can only mitigate identity theft's long-lasting negative impacts.

93.      Identity thieves can also use stolen personal information such as Social Security numbers and PHI for a variety of crimes, including credit card fraud, phone or utilities fraud, bank fraud, to obtain a driver's license or official identification card in the victim's name but with the thief's picture, to obtain government benefits, or to file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house in the victim's name, receive medical services in the victim's name, and even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

---

[19] *See IdentityTheft.gov,* Federal Trade Commission, *available at* https://www.identitytheft.gov/Steps (last visited June 11, 2023).

94.     In fact, a study by the Identity Theft Resource Center[20] shows the multitude of harms caused by fraudulent use of PII:



95.     PHI is also especially valuable to identity thieves.  As the FTC recognizes, identity thieves can use PHI to commit an array of crimes, including identity theft and medical and financial fraud.[21]

96.     Indeed, a robust cyber black market exists in which criminals openly post stolen PHI on multiple underground Internet websites, commonly referred to as the dark web.

---

[20] Steele, Jason, *Credit Card and ID Theft Statistics*, CreditCards.com (October 23, 2017), *available at* https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276/ (last visited on June 11, 2023).

[21] Federal Trade Commission, *Warning Signs of Identity Theft, available at*: https://consumer.ftc.gov/articles/what-know-about-identity-theft (last visited on June 11, 2023).

97.     While credit card information and associated PII can sell for as little as $1-$2 on the black market, protected health information can sell for as much as $363 according to the Infosec Institute.[22]

98.     PHI is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

99.     Medical identity theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[23]

100.     The ramifications of MercyOne's failure to keep its patients' Private Information secure are long lasting and severe. Once it is stolen, fraudulent use of such and damage to victims may continue for years.

101.     Here, not only was sensitive medical information compromised, but financial and health insurance information and Social Security numbers were compromised too. The value of

---

[22] Center for Internet Security, *Data Breaches: In the Healthcare Sector, available at*: https://www.cisecurity.org/insights/blog/data-breaches-in-the-healthcare-sector (last visited on June 11, 2023).

[23] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, *available at*: https://kffhealthnews.org/news/rise-of-indentity-theft/ (last visited on June 11, 2023).

both PII and PHI is axiomatic. The value of "big data" in corporate America is astronomical. The fact that identity thieves attempt to steal identities notwithstanding possible heavy prison sentences illustrates beyond a doubt that the Private Information compromised here has considerable market value.

102.    It must also be noted that there may be a substantial time lag between when harm occurs and when it is discovered, and also between when PII and/or PHI is stolen and when it is misused. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:[24]

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

103.    PII and PHI are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the dark web for years.

104.    As a result, Plaintiffs and Class Members are at an increased risk of fraud and identity theft, including medical identity theft, for many years into the future. Thus, Plaintiffs and Class Members have no choice but to vigilantly monitor their accounts for many years to come.

### J.  Plaintiffs' and Class Members' Damages

---

[24] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO (June 2007), *available at* https://www.gao.gov/assets/270/262904.html (last visited June 11, 2023).

105.   Plaintiffs and Class Members entrusted their Private Information to Defendants in order to receive Defendants' services.

106.   Their Private Information was subsequently compromised as a direct and proximate result of the Data Breach, which Data Breach resulted from Defendants' inadequate data security practices.

107.   As a direct and proximate result of MercyOne's actions and omissions, Plaintiffs and Class Members have been harmed and are at an imminent, immediate, and continuing increased risk of harm, including but not limited to, having medical services billed in their names, loans opened in their names, tax returns filed in their names, utility bills opened in their names, credit card accounts opened in their names, and other forms of identity theft.

108.   Further, and as set forth above, as a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have also been forced to take the time and effort to mitigate the actual and potential impact of the data breach on their everyday lives, including placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

109.   Plaintiffs and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

110.   Plaintiffs and Class Members also face a substantial risk of being targeted in future phishing, data intrusion, and other illegal schemes through the misuse of their Private Information, since potential fraudsters will likely use such Private Information to carry out such targeted schemes against Plaintiffs and Class Members.

111.    The Private Information maintained by and stolen from Defendants' systems, combined with publicly available information, allows nefarious actors to assemble a detailed mosaic of Plaintiffs and Class Members, which can also be used to carry out targeted fraudulent schemes against Plaintiffs and Class Members.

112.    Plaintiffs and Class Members also lost the benefit of the bargain they made with MercyOne. Plaintiffs and Class Members overpaid for services that were intended to be accompanied by adequate data security but were not. Indeed, part of the price Plaintiffs and Class Members paid to MercyOne (or which was paid on their behalf) was intended to be used by MercyOne to fund adequate security of MercyOne's systems and protect Plaintiffs' and Class Members' Private Information. Thus, Plaintiffs and the Class did not receive the benefit of the bargain.

113.    Additionally, Plaintiffs and Class Members also suffered a loss of value of their PII and PHI when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases. An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[25] In fact, the data marketplace is so sophisticated that consumers can sell their non-public information directly to a data broker who in turn aggregates the information and provides it to other companies.[26] Consumers who agree to provide their web browsing history to the Nielsen Corporation can in turn receive up to $50 a year.[27]

---

[25] See Data Coup, https://datacoup.com/.

[26] *What is digi.me?, DIGI.ME,* https://digi.me/what-is-digime/ (last visited Jan. 16, 2023).

[27] *Frequently Asked Questions,* Nielsen Computer & Mobile Panel,https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited Jan. 16, 2023).

114.    As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and illegal markets, has been harmed and diminished due to its acquisition by cybercriminals. This transfer of valuable information happened with no consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is apparently readily available to others, and the rarity of the Private Information has been destroyed because it is no longer only held by Plaintiffs and the Class Members, and because that data no longer necessarily correlates only with activities undertaken by Plaintiffs and the Class Members, thereby causing additional loss of value.

115.    Finally, Plaintiffs and Class Members have suffered or will suffer actual injury as a direct and proximate result of the Data Breach in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach. These losses include, but are not limited to, the following:

a.  Monitoring for and discovering fraudulent charges;

b.  Canceling and reissuing credit and debit cards;

c.  Addressing their inability to withdraw funds linked to compromised accounts;

d.  Taking trips to banks and waiting in line to obtain funds held in limited accounts;

e.  Spending time on the phone with or at a financial institution to dispute fraudulent charges;

f.  Contacting financial institutions and closing or modifying financial accounts;

g.  Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

h.  Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and

i.  Closely reviewing and monitoring bank accounts and credit reports for additional unauthorized activity for years to come.

116.  Moreover, Plaintiffs and Class Members have an interest in ensuring that their Private Information, which is believed to still be in the possession of MercyOne, is protected from future breaches by the implementation of more adequate data security measures and safeguards, including but not limited to, ensuring that the storage of data or documents containing highly sensitive personal and health information of its patients is not accessible online, that access to such data is password-protected, and that such data is properly encrypted.

117.  As a direct and proximate result of MercyOne's actions and inactions, Plaintiffs and Class Members have suffered a loss of privacy and have suffered cognizable harm, including an imminent and substantial future risk of harm, in the forms set forth above.

*Plaintiff Tiffany Harris' Experience*

118.  Plaintiff Harris is Defendants' patient and has sought medical care from Defendants in several instances.

119.  Plaintiff Harris is very careful about sharing her Private Information. Plaintiff Harris has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff Harris stores any documents containing his sensitive PII in a safe and

secure location or destroys the documents. Moreover, Plaintiff Harris diligently chooses unique usernames and passwords for her various online accounts.

120.    Plaintiff Harris only allowed Defendants to maintain, store, and use her Private Information because she believed that Defendants would use basic security measures to protect her Private Information, such as requiring passwords and multi-factor authentication to access databases storing his Private Information. As a result, Plaintiff's Private Information was within the possession and control of Defendants at the time of the Data Breach.

121.    Plaintiff Harris received the Notice of Data Breach Letter that her Private Information was involved in the Data Breach on or around May 23, 2023. It stated, in relevant part, that Plaintiff's name, date of birth, address, and Social Security number were disclosed in the Data Breach.

122.    Plaintiff Harris suffered injury from a loss of privacy the moment that her Private Information was accessed and exfiltrated by a third party without authorization.

123.    Plaintiff Harris has also suffered injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff entrusted to Defendant.

124.    The Data Breach has also caused Plaintiff Harris to suffer imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of criminals.

125.    This risk from the Data Breach has caused Plaintiff Harris to spend significant time dealing with issues related to the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach, and self-monitoring her accounts and credit reports to ensure no

fraudulent activity has occurred. This time, which has been lost forever and cannot be recaptured, was spent at Defendants' direction.

126.    The substantial risk of imminent harm and loss of privacy have caused Plaintiff Harris to suffer stress, fear, and anxiety. This risk is especially magnified because Plaintiff's Social Security number and name were exposed together, meaning third parties are more likely to access her financial accounts.

127.    Plaintiff Harris has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected, and safeguarded from future breaches.

*Plaintiff Rebecca Oberdorf's Experience*

128.    When Plaintiff Oberdorf became a patient of Defendants, they required that she provide them with substantial amounts of her PII and PHI.

129.    On or around June 2, 2023, Plaintiff Oberdorf received a letter from Defendants informing her that her PII and PHI had been accessed during the Data Breach. The notice letter informed her that the Private Information impacted may have included her "name, address, date of birth, driver's license/state identification number, Social Security number, financial account information, medical record number, encounter number, Medicare or Medicaid identification number, mental or physical treatment/condition information, diagnosis code/information, date of service, admission/discharge date, prescription information, billing/claims information, personal representative or guardian name, and health insurance information."

130.    Plaintiff Oberdorf suffered actual injury in the form of time spent dealing with the Data Breach and the increased risk of fraud resulting from the Data Breach and/or monitoring her accounts for fraud.

131.    Plaintiff Oberdorf would not have provided her PII and PHI to Defendants had Defendants timely disclosed that its systems lacked adequate computer and data security practices to safeguard its patients' personal and health information from theft, and that those systems were subject to a data breach.

132.    Plaintiff Oberdorf suffered actual injury in the form of having her PII and PHI compromised and/or stolen as a result of the Data Breach.

133.    Plaintiff Oberdorf suffered actual injury in the form of damages to and diminution in the value of her personal, health, and financial information – a form of intangible property that Plaintiff Oberdorf entrusted to Defendants for the purpose of receiving healthcare services from Defendants and which was compromised in, and as a result of, the Data Breach.

134.    Plaintiff Oberdorf suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by her Private Information being placed in the hands of criminals.

135.    Plaintiff Oberdorf has a continuing interest in ensuring that her PII and PHI, which remain in the possession of Defendants, are protected and safeguarded from future breaches.

136.    As a result of the Data Breach, Plaintiff Oberdorf made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing financial accounts for any indications of actual or attempted identity theft or fraud, and researching the credit monitoring offered by Defendants. Plaintiff Oberdorf has spent several hours dealing with the Data Breach, valuable time she otherwise would have spent on other activities.

137.    As a result of the Data Breach, Plaintiff Oberdorf has suffered anxiety as a result of the release of her PII and PHI, which she believed would be protected from unauthorized access and disclosure. These feelings include anxiety about unauthorized parties viewing, selling, and/or

using her PII and PHI for purposes of committing cyber and other crimes against her including, but not limited to, fraud and identity theft. Plaintiff Oberdorf is very concerned about this increased, substantial, and continuing risk, as well as the consequences that identity theft and fraud resulting from the Data Breach would have on her life.

138.   As a result of the Data Breach, Plaintiff Oberdorf anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the many harms caused by the Data Breach.

*Plaintiff Michael Prins' Experience*

139.   When Plaintiff Prins became a patient of Defendants, they required that he provide them with substantial amounts of his PII and PHI.

140.   On or around June 2, 2023, Plaintiff Prins received a letter from Defendants informing him that his PII and PHI had been accessed during the Data Breach. The notice letter informed him that the Private Information impacted may have included his "name, address, date of birth, driver's license/state identification number, Social Security number, financial account information, medical record number, encounter number, Medicare or Medicaid identification number, mental or physical treatment/condition information, diagnosis code/information, date of service, admission/discharge date, prescription information, billing/claims information, personal representative or guardian name, and health insurance information."

141.   Plaintiff Prins suffered actual injury in the form of time spent dealing with the Data Breach and the increased risk of fraud resulting from the Data Breach and/or monitoring his accounts for fraud.

142.   Plaintiff Prins would not have provided his PII and PHI to Defendants had Defendants timely disclosed that its systems lacked adequate computer and data security practices

to safeguard its patients' personal and health information from theft, and that those systems were subject to a data breach.

143.    Plaintiff Prins suffered actual injury in the form of having his PII and PHI compromised and/or stolen as a result of the Data Breach.

144.    Plaintiff Prins suffered actual injury in the form of damages to and diminution in the value of his personal, health, and financial information – a form of intangible property that Plaintiff Prins entrusted to Defendants for the purpose of receiving healthcare services from Defendants and which was compromised in, and as a result of, the Data Breach.

145.    Plaintiff Prins suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by his Private Information being placed in the hands of criminals.

146.    Plaintiff Prins has a continuing interest in ensuring that his PII and PHI, which remain in the possession of Defendants, are protected and safeguarded from future breaches.

147.    As a result of the Data Breach, Plaintiff Prins made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing financial accounts for any indications of actual or attempted identity theft or fraud, and researching the credit monitoring offered by Defendants. Plaintiff Prins has spent several hours dealing with the Data Breach, valuable time he otherwise would have spent on other activities.

148.    As a result of the Data Breach, Plaintiff Prins has suffered anxiety as a result of the release of his PII and PHI, which he believed would be protected from unauthorized access and disclosure. These feelings include anxiety about unauthorized parties viewing, selling, and/or using his PII and PHI for purposes of committing cyber and other crimes against him including, but not limited to, fraud and identity theft. Plaintiff Prins is very concerned about this increased,

substantial, and continuing risk, as well as the consequences that identity theft and fraud resulting from the Data Breach would have on his life.

149.     As a result of the Data Breach, Plaintiff Prins anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the many harms caused by the Data Breach.

*Plaintiff Jennifer Medenblik's Experience*

150.     When Plaintiff Medenblik became a patient of Defendants, they required that she provide them with substantial amounts of her PII and PHI.

151.     On or around June 2, 2023, Plaintiff Medenblik received a letter from Defendants informing her that her PII and PHI had been accessed during the Data Breach. The notice letter informed her that the Private Information impacted may have included her "name, address, date of birth, driver's license/state identification number, Social Security number, financial account information, medical record number, encounter number, Medicare or Medicaid identification number, mental or physical treatment/condition information, diagnosis code/information, date of service, admission/discharge date, prescription information, billing/claims information, personal representative or guardian name, and health insurance information."

152.     Plaintiff Medenblik suffered actual injury in the form of time spent dealing with the Data Breach and the increased risk of fraud resulting from the Data Breach and/or monitoring her accounts for fraud.

153.     Plaintiff Medenblik would not have provided her PII and PHI to Defendants had Defendants timely disclosed that its systems lacked adequate computer and data security practices to safeguard its patients' personal and health information from theft, and that those systems were subject to a data breach.

154.     Plaintiff Medenblik suffered actual injury in the form of having her PII and PHI compromised and/or stolen as a result of the Data Breach. Plaintiff Medenblik also received a notification through Experian alerting her that her personal information was found on the dark web.

155.     Plaintiff Medenblik suffered actual injury in the form of damages to and diminution in the value of her personal, health, and financial information – a form of intangible property that Plaintiff Medenblik entrusted to Defendants for the purpose of receiving healthcare services from Defendants and which was compromised in, and as a result of, the Data Breach.

156.     Plaintiff Medenblik suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by her Private Information being placed in the hands of criminals.

157.     Plaintiff Medenblik has a continuing interest in ensuring that her PII and PHI, which remain in the possession of Defendants, are protected and safeguarded from future breaches.

158.     As a result of the Data Breach, Plaintiff Medenblik made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing financial accounts for any indications of actual or attempted identity theft or fraud, and researching the credit monitoring offered by Defendants. Plaintiff Medenblik has spent several hours dealing with the Data Breach, valuable time she otherwise would have spent on other activities.

159.     As a result of the Data Breach, Plaintiff Medenblik has suffered anxiety as a result of the release of her PII and PHI, which she believed would be protected from unauthorized access and disclosure. These feelings include anxiety about unauthorized parties viewing, selling, and/or using her PII and PHI for purposes of committing cyber and other crimes against her including,

but not limited to, fraud and identity theft. Plaintiff Medenblik is very concerned about this increased, substantial, and continuing risk, as well as the consequences that identity theft and fraud resulting from the Data Breach would have on her life.

160.   As a result of the Data Breach, Plaintiff Medenblik anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the many harms caused by the Data Breach.

161.   In sum, Plaintiffs and Class Members have been damaged by the compromise of their Private Information in the Data Breach.

*Plaintiff Jeremy Shine*

162.   Plaintiff Shine is Defendants' patient and has sought medical care from Defendants in several instances.

163.   Plaintiff Shine is very careful about sharing his Private Information. Plaintiff Harris has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff Shine stores any documents containing his sensitive PII in a safe and secure location or destroys the documents. Moreover, Plaintiff Shine diligently chooses unique usernames and passwords for his various online accounts.

164.   Plaintiff Shine only allowed Defendant to maintain, store, and use his Private Information because he believed that Defendant would use basic security measures to protect his Private Information, such as requiring passwords and multi-factor authentication to access databases storing his Private Information. As a result, Plaintiff's Private Information was within the possession and control of Defendant at the time of the Data Breach.

165.   Plaintiff Shine received the Notice of Data Breach Letter that his Private Information was involved in the Data Breach on or around May 23, 2023. It stated, in relevant

part, that Plaintiff's name, date of birth, address, and Social Security number were disclosed in the Data Breach.

166. Plaintiff Shine suffered injury from a loss of privacy the moment that his Private Information was accessed and exfiltrated by a third party without authorization.

167. Plaintiff Shine has also suffered injury in the form of damages to and diminution in the value of his Private Information—a form of intangible property that Plaintiff entrusted to Defendant.

168. As a result of the Data Breach, Plaintiff Shine has received notifications that his information was shared on the dark web on at least 12 occasions.

169. As a result of the Data Breach, Plaintiff Shine has seen fraudulent vehicles on his credit report.

170. As a result of the Data Breach, Plaintiff Shine saw a third party attempted to obtain a new line of credit through Plaintiff's credit card account.

171. The Data Breach has also caused Plaintiff Shine to suffer imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of criminals.

172. This risk from the Data Breach has caused Plaintiff Shine to spend significant time dealing with issues related to the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach, and self-monitoring his accounts and credit reports to ensure no fraudulent activity has occurred. This time, which has been lost forever and cannot be recaptured, was spent at Defendants' direction.

173. The substantial risk of imminent harm and loss of privacy have caused Plaintiff Harris to suffer stress, fear, and anxiety. This risk is especially magnified because Plaintiff's Social

Security number and name were exposed together, meaning third parties are more likely to access his financial accounts.

174.    Plaintiff Harris has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

## V.    CLASS ACTION ALLEGATIONS

175.    Plaintiffs bring this action individually and on behalf of all other persons similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), 23(b)(3), and 23(c)(4).

176.    Specifically, Plaintiffs propose the following Class, subject to amendment as appropriate:

> All individuals in the United States who had their Private Information either accessed or acquired as a result of the Data Breach, including all who were sent a notice of the Data Breach.

177.    Excluded from the Class are Defendants and their parents or subsidiaries, any entities in which they have a controlling interest, as well as their officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

178.    Plaintiffs reserve the right to modify or amend the definitions of the proposed Class before the Court determines whether certification is appropriate.

179.    Numerosity. The Class Members are so numerous that joinder of all members is impracticable. Though the exact number and identities of Class Members are unknown at this time, based on information and belief, the Class consists of over 20,000 patients of MercyOne whose data was compromised in the Data Breach. The identities of Class Members are ascertainable

through MercyOne's records, Class Members' records, publication notice, self-identification, and other means.

180.   <u>Commonality</u>. There are questions of law and fact common to the Class that predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.   Whether MercyOne engaged in the conduct alleged herein;

b.   Whether MercyOne's conduct violated the FTCA and/or HIPAA;

c.   When MercyOne learned of the Data Breach;

d.   Whether MercyOne's response to the Data Breach was adequate;

e.   Whether MercyOne unlawfully lost or disclosed Plaintiffs' and Class Members' Private Information;

f.   Whether MercyOne failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

g.   Whether MercyOne's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

h.   Whether MercyOne's data security systems prior to and during the Data Breach were consistent with industry standards;

i.   Whether MercyOne owed a duty to Class Members to safeguard their Private Information;

j.   Whether MercyOne breached its duty to Class Members to safeguard their Private Information;

k.  Whether hackers obtained Class Members' Private Information via the Data Breach;

l.  Whether MercyOne had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiffs and the Class Members;

m.  Whether MercyOne breached its duty to provide timely and accurate notice of the Data Breach to Plaintiffs and Class Members;

n.  Whether MercyOne knew or should have known that its data security systems and monitoring processes were deficient;

o.  What damages Plaintiffs and Class Members suffered as a result of MercyOne's misconduct;

p.  Whether MercyOne's conduct was negligent;

q.  Whether MercyOne's conduct was *per se* negligent;

r.  Whether MercyOne was unjustly enriched;

s.  Whether Plaintiffs and Class Members are entitled to actual and/or statutory damages;

t.  Whether Plaintiffs and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

u.  Whether Plaintiffs and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

181.    Typicality. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Private Information, like that of every other Class Member, was compromised in the Data Breach. Plaintiffs' claims are typical of those of the other Class Members because, *inter alia*,

all Class Members were injured through the common misconduct of MercyOne. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class Members, and there are no defenses that are unique to Plaintiffs. The claims of Plaintiffs and those of Class Members arise from the same operative facts and are based on the same legal theories.

182.    <u>Adequacy of Representation</u>. Plaintiffs will fairly and adequately represent and protect the interests of Class Members. Plaintiffs' counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

183.    <u>Predominance</u>. MercyOne has engaged in a common course of conduct toward Plaintiffs and Class Members in that all of Plaintiffs' and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from MercyOne's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

184.    <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for MercyOne. In contrast, conducting this action as a class action presents far fewer management

difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

185.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2). MercyOne has acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

186.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.  Whether Defendants owed a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

    b.  Whether Defendants breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

    c.  Whether Defendants failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

    d.  Whether an implied contract existed between Defendants on the one hand, and Plaintiffs and Class Members on the other, and the terms of that implied contract;

    e.  Whether Defendants breached the implied contract;

    f.  Whether Defendants adequately and accurately informed Plaintiffs and Class Members that their Private Information had been compromised;

    g.  Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

    h.  Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendants' wrongful conduct.

187.    Finally, all members of the proposed Class are readily ascertainable. MercyOne has access to the names and addresses and/or email addresses of Class Members affected by the Data

Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by MercyOne.

## CLAIMS FOR RELIEF

## COUNT I
## NEGLIGENCE
## (ON BEHALF OF PLAINTIFFS AND THE CLASS)

188.    Plaintiffs restate and reallege all of the allegations stated above and hereafter as if fully set forth herein.

189.    MercyOne knowingly collected, came into possession of, and maintained Plaintiffs' and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such Information from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

190.    MercyOne knew or should have known of the risks inherent in collecting the Private Information of Plaintiffs and Class Members and the importance of adequate security. MercyOne was on notice because, on information and belief, it knew or should have known that it would be an attractive target for cyberattacks.

191.    MercyOne owed a duty of care to Plaintiffs and Class Members whose Private Information was entrusted to it. MercyOne's duties included, but were not limited to, the following:

      a.  To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in its possession;

      b.  To protect patients' Private Information using reasonable and adequate security procedures and systems compliant with industry standards;

c.   To have procedures in place to prevent the loss or unauthorized dissemination of Private Information in its possession;

d.   To employ reasonable security measures and otherwise protect the Private Information of Plaintiffs and Class Members pursuant to HIPAA and the FTCA;

e.   To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

f.   To promptly notify Plaintiffs and Class Members of the Data Breach, and to precisely disclose the type(s) of information compromised.

192.   MercyOne's duty to employ reasonable data security measures arose, in part, under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

193.   MercyOne's duty also arose because Defendants were bound by industry standards to protect patients' confidential Private Information.

194.   Plaintiffs and Class Members were foreseeable victims of any inadequate security practices on the part of Defendants, and MercyOne owed them a duty of care to not subject them to an unreasonable risk of harm.

195.   MercyOne, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiffs' and Class Members' Private Information within MercyOne's possession.

196.    MercyOne, by its actions and/or omissions, breached its duty of care by failing to provide, or acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the Private Information of Plaintiffs and Class Members.

197.    MercyOne, by its actions and/or omissions, breached its duty of care by failing to promptly identify the Data Breach and then failing to provide prompt notice of the Data Breach to the persons whose Private Information was compromised.

198.    MercyOne breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

     a.   Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

     b.   Failing to adequately monitor the security of its networks and systems;

     c.   Failing to periodically ensure that its email system maintained reasonable data security safeguards;

     d.   Allowing unauthorized access to Class Members' Private Information;

     e.   Failing to comply with the FTCA; and

     f.   Failing to detect in a timely manner that Class Members' Private Information had been compromised.

199.    MercyOne had a special relationship with Plaintiffs and Class Members. Plaintiffs' and Class Members' willingness to entrust MercyOne with their Private Information was predicated on the understanding that MercyOne would take adequate security precautions. Moreover, only MercyOne had the ability to protect its systems (and the Private Information that it stored on them) from attack.

200.    MercyOne's breach of duties owed to Plaintiffs and Class Members caused Plaintiffs' and Class Members' Private Information to be compromised, exfiltrated, and/or misused, as alleged herein.

201.    As a result of MercyOne's ongoing failure to notify Plaintiffs and Class Members regarding exactly what Private Information has been compromised, Plaintiffs and Class Members have been unable to take the necessary precautions to prevent future fraud and mitigate damages.

202.    MercyOne's breaches of duty also caused a substantial, imminent risk to Plaintiffs and Class Members of identity theft, loss of control over their Private Information, and/or loss of time and money to monitor their accounts for fraud.

203.    As a result of MercyOne's negligence in breach of its duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes.

204.    MercyOne also had independent duties under state laws that required it to reasonably safeguard Plaintiffs' and Class Members' Private Information and promptly notify them about the Data Breach.

205.    As a direct and proximate result of MercyOne's negligent conduct, Plaintiffs and Class Members have suffered damages as alleged herein and are at imminent risk of further harm.

206.    The injury and harm that Plaintiffs and Class Members suffered was reasonably foreseeable.

207.    Plaintiffs and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

208.    In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring MercyOne to, *inter alia*, strengthen its data security systems and

monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

**COUNT II**
**NEGLIGENCE *PER SE***
**(ON BEHALF OF PLAINTIFFS AND THE CLASS)**

209.    Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

210.    Pursuant to Section 5 of the FTCA, MercyOne had a duty to provide fair and adequate computer systems and data security to safeguard the Private Information of Plaintiffs and Class Members.

211.    Pursuant to HIPAA, 42 U.S.C. § 1302(d), *et seq.*, MercyOne had a duty to implement reasonable safeguards to protect Plaintiffs' and Class Members' Private Information.

212.    Specifically, pursuant to HIPAA, Defendants had a duty to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without the use of a confidential process or key." *See* definition of "encryption" at 45 C.F.R. § 164.304.

213.    MercyOne breached its duties to Plaintiffs and Class Members under the FTCA and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

214.    Specifically, MercyOne breached its duties by failing to employ industry-standard cybersecurity measures in order to comply with the FTCA, including but not limited to proper segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing.

215.    The FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice of failing to use reasonable measures to protect PII and PHI (such as the Private Information compromised in the Data Breach). The FTC rulings and publications described above, together with the industry-standard cybersecurity measures set forth herein, form part of the basis of MercyOne's duty in this regard.

216.    MercyOne also violated the FTCA and HIPAA by failing to use reasonable measures to protect the Private Information of Plaintiffs and the Class and by not complying with applicable industry standards, as described herein.

217.    It was reasonably foreseeable, particularly given the growing number of data breaches of Private Information, that the failure to reasonably protect and secure Plaintiffs' and Class Members' Private Information in compliance with applicable laws would result in an unauthorized third-party gaining access to MercyOne's networks, databases, and computers that stored Plaintiffs' and Class Members' unencrypted Private Information.

218.    Plaintiffs and Class Members are within the class of persons that the FTCA and HIPAA are intended to protect and MercyOne's failure to comply with both constitutes negligence *per se*.

219.    Plaintiffs' and Class Members' Private Information constitutes personal property that was stolen due to MercyOne's negligence, resulting in harm, injury, and damages to Plaintiffs and Class Members.

220.    As a direct and proximate result of MercyOne's negligence *per se*, Plaintiffs and the Class have suffered, and continue to suffer, injuries and damages arising from the unauthorized access of their Private Information, including but not limited to damages from the actual and/or

future risk of misuse of their Private Information and the lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives.

221.     As a direct and proximate result of MercyOne's negligent conduct, Plaintiffs and Class Members have suffered injury and are entitled to compensatory and consequential damages in an amount to be proven at trial.

222.     In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring MercyOne to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

**COUNT III**
**BREACH OF CONTRACT**
**(ON BEHALF OF PLAINTIFFS AND THE CLASS)**

223.     Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

224.     Plaintiffs and Class Members entered into a valid and enforceable contract through which they paid money to MercyOne in exchange for services. That contract included promises by Defendants to secure, safeguard, and not disclose Plaintiffs' and Class Members' Private Information.

225.     MercyOne's Privacy Policy memorialized the rights and obligations of MercyOne and its patients. This document was provided to Plaintiffs and Class Members in a manner in which it became part of the agreement for services.

226.     In the Privacy Policy, MercyOne commits to protecting the privacy and security of private information and promises to never share Plaintiffs' and Class Members' Private Information except under certain limited circumstances.

227.     Plaintiffs and Class Members fully performed their obligations under their contracts with MercyOne.

228.     However, MercyOne did not secure, safeguard, and/or keep private Plaintiffs' and Class Members' Private Information, and therefore MercyOne breached its contracts with Plaintiffs and Class Members.

229.     MercyOne allowed third parties to access, copy, and/or exfiltrate Plaintiffs' and Class Members' Private Information without permission. Therefore, MercyOne breached the Privacy Policy with Plaintiffs and Class Members.

230.     MercyOne's failure to satisfy its confidentiality and privacy obligations, specifically those arising under the FTCA, HIPAA, and applicable industry standards, resulted in MercyOne providing services to Plaintiffs and Class Members that were of a diminished value.

231.     As a result, Plaintiffs and Class Members have been harmed, damaged, and/or injured as described herein, including in Defendants' failure to fully perform its part of the bargain with Plaintiffs and Class Members.

232.     As a direct and proximate result of MercyOne's conduct, Plaintiffs and Class Members suffered and will continue to suffer damages in an amount to be proven at trial.

233.     In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring MercyOne to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

**COUNT IV**
**BREACH OF IMPLIED CONTRACT**
**(ON BEHALF OF PLAINTIFFS AND THE CLASS)**

234.    Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

235.    This Count is pleaded in the alternative to Count III above.

236.    MercyOne provided medical services to Plaintiffs and Class Members. Plaintiffs and Class Members formed an implied contract with Defendants regarding the provision of those services through their collective conduct, including by Plaintiffs and Class Members (or their insurance) paying to receive such services from Defendants.

237.    Through Defendants' sale and provision of medical services, it knew or should have known that it must protect Plaintiffs' and Class Members' confidential Private Information in accordance with MercyOne's policies, practices, and applicable law.

238.    As consideration, Plaintiffs and Class Members paid money to MercyOne and turned over valuable Private Information to MercyOne. Accordingly, Plaintiffs and Class Members bargained with MercyOne for it to securely maintain and store their Private Information.

239.    MercyOne accepted possession of Plaintiffs' and Class Members' Private Information for the purpose of providing services to Plaintiffs and Class Members.

240.    In delivering their Private Information to MercyOne and paying to receive medical services, Plaintiffs and Class Members intended and understood that MercyOne would adequately safeguard the Private Information as part of those services.

241.    Defendants' implied promises to Plaintiffs and Class Members include, but are not limited to, (1) taking steps to ensure that anyone who is granted access to Private Information also protect the confidentiality of that data; (2) taking steps to ensure that the Private Information that

is placed in the control of its employees is restricted and limited to achieve an authorized business purpose; (3) restricting access to qualified and trained employees and/or agents; (4) designing and implementing appropriate retention policies to protect the Private Information against criminal data breaches; (5) applying or requiring proper encryption; (6) implementing multifactor authentication for access; (7) complying with HIPAA standards to make sure that Plaintiffs' and Class Members' PHI would remain protected; and (8) taking other steps to protect against foreseeable data breaches.

242.    Plaintiffs and Class Members would not have entrusted their Private Information to MercyOne in the absence of such an implied contract.

243.    Had Defendants disclosed to Plaintiffs and the Class that they did not have adequate computer systems and security practices to secure sensitive data, Plaintiffs and Class Members would not have provided their Private Information to MercyOne.

244.    As a provider of healthcare, MercyOne recognized (or should have recognized) that Plaintiffs' and Class Members' Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain with Plaintiffs and the other Class Members.

245.    MercyOne violated these implied contracts by failing to employ reasonable and adequate security measures to secure Plaintiffs' and Class Members' Private Information. MercyOne further breached these implied contracts by failing to comply with its promise to abide by HIPAA.

246.    Additionally, MercyOne breached the implied contracts with Plaintiffs and Class Members by failing to ensure the confidentiality and integrity of electronic protected health

information it created, received, maintained, and transmitted, in violation of 45 CFR 164.306(a)(1).

247.     MercyOne also breached the implied contracts with Plaintiffs and Class Members by failing to implement technical policies and procedures for electronic systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights, in violation of 45 CFR 164.312(a)(1).

248.     MercyOne further breached the implied contracts with Plaintiffs and Class Members by failing to implement policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 CFR 164.308(a)(1).

249.     MercyOne further breached the implied contracts with Plaintiffs and Class Members by failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 CFR 164.308(a)(6)(ii).

250.     MercyOne further breached the implied contracts with Plaintiffs and Class Members by failing to protect against any reasonably anticipated threats or hazards to the security or integrity of electronic protected health information, in violation of 45 CFR 164.306(a)(2).

251.     MercyOne further breached the implied contracts with Plaintiffs and Class Members by failing to protect against any reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 CFR 164.306(a)(3).

252.     MercyOne further breached the implied contracts with Plaintiffs and Class Members by failing to ensure compliance with the HIPAA security standard rules by its workforce violations, in violation of 45 CFR 164.306(a)(4).

253.    MercyOne further breached the implied contracts with Plaintiffs and Class Members by impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons, in violation of 45 CFR 164.502, *et seq*.

254.    MercyOne further breached the implied contracts with Plaintiffs and Class Members by failing to design, implement, and enforce policies and procedures establishing physical administrative safeguards to reasonably safeguard protected health information, in violation of 45 CFR 164.530(c).

255.    MercyOne further breached the implied contracts with Plaintiffs and Class Members by otherwise failing to safeguard Plaintiffs' and Class Members' PHI.

256.    A meeting of the minds occurred, as Plaintiffs and Class Members agreed, *inter alia*, to provide accurate and complete Private Information and to pay (or have their insurance pay) MercyOne in exchange for MercyOne's agreement to, *inter alia*, protect their Private Information.

257.    Plaintiffs and Class Members have been damaged by MercyOne's conduct, including the harms and injuries arising from the Data Breach now and in the future, as alleged herein.

**COUNT V**
**UNJUST ENRICHMENT**
**(ON BEHALF OF PLAINTIFFS AND THE CLASS)**

258.    Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

259.    This Count is pleaded in the alternative to Counts III and IV above.

260.    Plaintiffs and Class Members conferred a benefit on MercyOne by turning over their Private Information to Defendants and/or by paying for services that should have included

cybersecurity protection to protect their Private Information. Plaintiffs and Class Members did not receive such protection.

261.    Upon information and belief, MercyOne funds its data security measures entirely from its general revenue, including from payments made to it by Plaintiffs and Class Members and/or on Plaintiffs' and Class Members' behalf.

262.    As such, a portion of the payments made by Plaintiffs and Class Members or on their behalf is to be used to provide a reasonable and adequate level of data security that is in compliance with applicable state and federal regulations and industry standards, and the amount of the portion of each payment made that is allocated to data security is known to MercyOne.

263.    MercyOne has retained the benefits of its unlawful conduct, including the amounts of payment received from Plaintiffs and Class Members or their health insurers that should have been used for adequate cybersecurity practices that it failed to provide.

264.    MercyOne knew that Plaintiffs and Class Members conferred a benefit upon it, which MercyOne accepted. MercyOne profited from these transactions and used the Private Information of Plaintiffs and Class Members for business purposes, while failing to use the payments it received for adequate data security measures that would have secured Plaintiffs' and Class Members' Private Information and prevented the Data Breach.

265.    If Plaintiffs and Class Members had known that MercyOne had not adequately secured their Private Information, they would not have agreed to provide such Private Information to Defendants.

266.    Due to MercyOne's conduct alleged herein, it would be unjust and inequitable under the circumstances for MercyOne to be permitted to retain the benefit of its wrongful conduct.

267.    As a direct and proximate result of MercyOne's conduct, Plaintiffs and Class Members have suffered and/or are at a continuous and imminent risk of suffering injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity to control how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains in MercyOne's possession and is subject to further unauthorized disclosures so long as MercyOne fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

268.    Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from MercyOne and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by MercyOne from its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiffs and Class Members may seek restitution or compensation.

269.    Plaintiffs and Class Members may not have an adequate remedy at law against MercyOne, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

## COUNT VI
## BREACH OF CONFIDENCE
## (ON BEHALF OF PLAINTIFFS AND THE CLASS)

270. Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

271. Plaintiffs and Class Members have an interest, both equitable and legal, in the Private Information about them that was conveyed to, collected by, and maintained by MercyOne and ultimately accessed and acquired in the Data Breach.

272. As a healthcare provider, MercyOne has a special, fiduciary relationship with its patients, including Plaintiffs and Class Members. Because of that special relationship, MercyOne was provided with and stored Plaintiffs' and Class Members' Private Information and had a duty to maintain such Information in confidence.

273. Patients like Plaintiffs and Class Members have a privacy interest in personal medical and other matters, and MercyOne had a duty not to disclose such matters concerning its patients.

274. As a result of the parties' relationship, MercyOne had possession and knowledge of highly sensitive and confidential PHI and PII belonging to Plaintiffs and Class Members, information that was not generally known.

275. Plaintiffs and Class Members did not consent nor authorize Defendants to release or disclose their Private Information to an unknown criminal actor.

276. MercyOne breached its duty of confidence owed to Plaintiffs and Class Members by, among other things: (a) mismanaging its systems and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of patient information that resulted in the unauthorized access and compromise of Plaintiffs' and Class Members' Private

Information; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement adequate information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the Data Breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies and practices published to its patients; and (h) making an unauthorized and unjustified disclosure and release of Plaintiffs' and Class members' Private Information to a criminal third party.

277.    But for MercyOne's wrongful breach of its duty of confidence owed to Plaintiffs and Class Members, their Private Information would not have been compromised.

278.    As a direct and proximate result of MercyOne's wrongful breach of its duty of confidence, Plaintiffs and Class Members have suffered and will continue to suffer the injuries alleged herein.

279.    It would be inequitable for MercyOne to retain the benefit of controlling and maintaining Plaintiffs' and Class Members' Private Information at the expense of Plaintiffs and Class Members.

280.    Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, and/or disgorgement or restitution, in an amount to be proven at trial.

## COUNT VII
### BREACH OF FIDUCIARY DUTY
### (ON BEHALF OF PLAINTIFFS AND THE CLASS)

281.    Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

282.     Plaintiffs and MercyOne established a special relationship by virtue of Defendant accepting their Private Information in the ordinary course of providing medical treatment to Plaintiffs. By accepting and storing Plaintiffs' Private Information in the course of providing medical treatment and services and the scope of that relationship, MercyOne accepted the duty to safeguard Plaintiffs' Private Information.

283.     In light of the special relationship between MercyOne and Plaintiffs and Class Members, whereby MercyOne became guardians of Plaintiffs' and Class Members' Private Information, MercyOne became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for the benefit of its patients, including Plaintiffs and Class Members, as follows: (1) for the safeguarding of Plaintiffs' and Class Members' Private Information; (2) to timely notify Plaintiffs and Class Members of the Data Breach and disclosure; and (3) to maintain complete and accurate records of what customer information (and where) Defendants did and do store.

284.     MercyOne had a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of this relationship, in particular, to keep secure the Private Information of its customers.

285.     MercyOne breached its fiduciary duties to Plaintiffs and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period of time.

286.     MercyOne breached its fiduciary duties to Plaintiffs and Class Members by failing to encrypt and otherwise protect the integrity of the systems containing Plaintiffs' and Class Members' Private Information.

287.     MercyOne breached its fiduciary duties owed to Plaintiffs and Class Members by failing to timely notify and/or warn Plaintiffs and Class Members of the Data Breach.

288.     MercyOne breached its fiduciary duties to Plaintiffs and Class Members by otherwise failing to safeguard Plaintiffs' and Class Members' Private Information.

289.     As a direct and proximate result of MercyOne's breach of its fiduciary duties, Plaintiffs and Class Members have suffered and will suffer injury, including, but not limited to, the follwing: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information in its continued possession; (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and (vii) the diminished value of Defendants' services received.

290.     As a direct and proximate result of MercyOne's breaching its fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

## COUNT VIII
## DECLARATORY AND INJUNCTIVE RELIEF
## (ON BEHALF OF PLAINTIFFS AND THE CLASS)

291.     Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

292.     Plaintiffs pursue this claim under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

293.     Defendants owe a duty of care to Plaintiffs and Class Members that require it to adequately secure Plaintiffs' and Class Members' Private Information.

294.     Defendants failed to fulfill their duty of care to safeguard Plaintiffs' and Class Members' Private Information.

295.     As described above, actual harm has arisen in the wake of the Data Breach regarding Defendants' contractual obligations and duties of care to provide security measures to Plaintiffs and Class Members. Further, Plaintiffs and Class Members are at risk of additional or further harm due to the exposure of their Private Information and Defendants' failure to address the security failings that led to such exposure.

296.     There is no reason to believe that Defendants' employee training and security measures are any more adequate now than they were before the breach to meet Defendants' contractual obligations and legal duties.

297.     Plaintiffs, therefore, seek a declaration (1) that Defendants' existing data security measures do not comply with their contractual obligations and duties of care to provide adequate data security, and (2) that to comply with their contractual obligations and duties of care, Defendants must implement and maintain reasonable security measures, including, but not limited to, the following:

a. Engaging internal security personnel to conduct testing, including audits on Defendants' systems, on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

b. Engaging third-party security auditors and internal personnel to run automated security monitoring;

c. Auditing, testing, and training Defendants' security personnel and employees regarding any new or modified data security policies and procedures;

d. Purging, deleting, and destroying, in a reasonably secure manner, any Private Information not necessary for Defendants' provision of services;

e. Conducting regular database scanning and security checks; and

f. Routinely and continually conducting internal training and education to inform internal security personnel and employees how to safely share and maintain highly sensitive personal information, including but not limited to, Plaintiffs and Class Members' Private Information.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class described above, seek the following relief:

a. An order certifying this action as a Class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiffs are proper representatives of the Class requested herein;

b. Judgment in favor of Plaintiffs and Class Members awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, and statutory costs;

c.   An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein, including but not limited to, the following measures:

1.   engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on MercyOne's systems on a periodic basis, and ordering MercyOne to promptly correct any problems or issues detected by such third-party security auditors;

2.   engaging third-party security auditors and internal personnel to run automated security monitoring;

3.   auditing, testing, and training its security personnel regarding any new or modified procedures;

4.   segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of MercyOne's systems;

5.   conducting regular database scanning and security checks;

6.   routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

7.   meaningfully educating its users about the threats they face with regard to the security of their Private Information, as well as the steps MercyOne's patients should take to protect themselves.

d.  An order instructing MercyOne to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members;

e.  An order requiring MercyOne to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

f.  A judgment in favor of Plaintiffs and Class Members awarding them prejudgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

g.  An award of such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all triable issues.

Dated: October 16, 2023                    Respectfully submitted,

/s/ J. Barton Goplerud_____
J. Barton Goplerud, AT0002983
Brian O. Marty, AT0011622
**SHINDLER ANDERSON GOPLERUD &
WEESE PC.**
5015 Grand Ridge Drive, Suite 100
West Des Moines, Iowa 50265-5749
Telephone: (515) 223-4567
Facsimile:  (515) 223-8887

Jeffrey O'Brien, AT0014827
Bryan L. Bleichner (admitted *pro hac vice*)
Philip J. Krzeski (admitted *pro hac vice*)
**CHESTNUT CAMBRONNE PA**
100 Washington Avenue South, Suite 1700
Minneapolis, MN 55401
Phone: (612) 339-7300
Fax: (612) 336-2940
*jobrien@chestnutcambronne.com*
*bbliechner@chestnutcambronne.com*
*pkrzeski@chestnutcambronne.com*

Dylan J. Gould (admitted *pro hac vice*)
Terry R. Coates (admitted *pro hac vice*)
**MARKOVITS STOCK &
DEMARCO, LLC**
119 E. Court Street, Suite 530
Cincinnati, OH 45202
Phone: (513) 651-3700
*dgould@msdlegal.com*
*tcoates@msdlegal.com*

Josh Sanford (*pro hac vice* pending)
**SANFORD LAW FIRM, PLLC**
10800 Financial Centre, Pkwy., Ste. 510
Little Rock, Arkansas 72211
Phone: (501) 787-2040
*josh@sanfordlawfirm.com*

Mason A. Barney (admitted *pro hac vice*)
Tyler J. Bean (admitted *pro hac vice*)
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
*mbarney@sirillp.com*
*tbean@sirillp.com*

*Counsel for Plaintiffs and Putative Rule 23 Class*