IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| TIFFANY HARRIS et al., on Behalf of Themselves and All Others Similarly Situated, | |
| Plaintiffs, | No.  4:23-cv-00195-SHL-SBJ |
| vs. | |
| MERCY HEALTH NETWORK, INC. d/b/a MERCYONE CLINICS et al., | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS** |
| Defendants. | |

Shortly after being notified of a data breach involving their private information, Plaintiffs sued Mercy Health Network, Inc. d/b/a MercyOne Clinics and Mercy Medical Center-Clinton, Inc. (collectively, "MercyOne"[1]) on various tort and contract theories. MercyOne moves to dismiss for lack of standing and/or failure to state a claim.

The Court GRANTS IN PART and DENIES IN PART MercyOne's motion (ECF 33.) Plaintiffs' contract theories are not viable because: (i) they did not enter into contracts with MercyOne for the protection of their private information; and (ii) their implied contract and unjust enrichment claims fail as a matter of law under binding Eighth Circuit precedent. As to the tort claims, four of the five Plaintiffs lack standing to bring them because those Plaintiffs have not plausibly alleged a past injury or substantial risk of future injury. The fifth Plaintiff, Jeremy Shine, *does* have standing to bring tort claims, but most of them fail on the merits under Iowa law. The only exceptions are his claims for negligence and negligence per se, which will be allowed to proceed as to his alleged loss of privacy, loss of time, and diminution in value injuries, but not his alleged emotional distress injuries.

---

[1] Plaintiffs originally brought three separate actions related to the data breach against Mercy Health Network, Inc., Trinity Health Corporation, and Mercy Medical Center-Clinton, Inc. (*See* Case Nos. 4:23-cv-00195; 4:23-cv-00197; 4:23-cv-00235.) The Court consolidated the cases into Case No. 4:23-cv-00195 and administratively closed Case Nos. 4:23-cv-00197 and 4:23-cv-00235. (ECF 24.) On October 16, 2023, Plaintiffs filed their Consolidated Class Action Complaint naming only Mercy Health Network, Inc., and Mercy Medical Center-Clinton, Inc., as Defendants. (ECF 32.)

## I.    FACTUAL BACKGROUND.[2]

On or around June 3, 2023, MercyOne, a health care provider, announced that there had been a data breach resulting in an unauthorized actor having access to MercyOne systems that store personal and protected health information. (ECF 32, ¶ 3.) According to MercyOne, the data breach occurred between March 7, 2023, and April 4, 2023, and resulted in the unauthorized actor having access to the following patient information: address, date of birth, driver's license and state identification number, Social Security number, financial account information, medical records number, encounter number, Medicare or Medicaid identification number, mental or physical treatment/condition information, diagnosis code/information, date of service, admission/discharge date, prescription information, billing/claims information, personal representative or guardian name, and health insurance information (referred to in the Class Action Complaint as "Private Information"). (Id., ¶¶ 1, 4.)

Ten days after MercyOne's notice of data breach, Plaintiff Tiffany Harris filed a lawsuit on behalf of herself and a putative class of similarly situated people. (ECF 1.) Following consolidation of her case with two others, she and four other Plaintiffs filed a Consolidated Class Action Complaint (the "Consolidated Complaint"). (ECF 32.) Plaintiffs allege that MercyOne violated state and federal laws and breached applicable duties of care by failing to properly maintain and safeguard their Private Information. (Id., ¶¶ 58, 75, 81, 83.) Plaintiffs allege that they "have been harmed and are at an imminent, immediate, and continuing increased risk of harm, including but not limited to, having medical services billed in their names, loans opened in their names, tax returns filed in their names, utility bills opened in their names, credit card accounts opened in their names, and other forms of identity theft." (Id., ¶ 107.) They further allege that they have been forced to expend time and effort to mitigate the actual and potential impact of the data breach on their lives, including placing "freezes" or "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely monitoring bank accounts and credit reports. (Id., ¶ 108.) They also "may" incur out-of-pocket costs for protective measures and "face a substantial risk of being targeted in future phishing, data intrusion, and other illegal schemes" perpetrated by potential fraudsters. (Id., ¶¶ 109–10.)

---

[2] On a motion to dismiss, the Court accepts as true all well-pled facts and draws all reasonable inferences in the light most favorable to Plaintiffs. *Glick v. W. Power Sports, Inc*., 944 F.3d 714, 717 (8th Cir. 2019). The recitation of facts in the Background section is designed to be consistent with this standard and should not be construed as findings of fact for any other purpose

Plaintiffs allege that they "lost the benefit of the bargain they made with MercyOne" in the sense that they "overpaid for services that were intended to be accompanied by adequate data security but were not." (Id., ¶ 112.) They also allege that they "suffered a loss of value of their [Private Information] when it was acquired by cyber thieves in the Data Breach" and "have suffered or will suffer actual injury as a direct and proximate result of the Data Breach in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach." (Id., ¶¶ 113–15.) The possible out-of-pocket expenses and time include monitoring for and discovering fraudulent charges, canceling and reissuing debit and credit cards, "[a]ddressing their inability to withdraw funds linked to compromised accounts," spending time on the phone or going to banks to dispute fraudulent charges, obtain funds, and/or close financial accounts, resetting automatic billing and payment instructions from compromised credit and debit cards to new ones, paying late fees and declined payment fees as a result of compromised cards that had to be canceled, and closely monitoring back accounts and credit reports. (Id., ¶ 115.) Plaintiffs say they have "suffered a loss of privacy and have suffered cognizable harm, including an imminent and substantial future risk of harm. . . ." (Id., ¶ 117.)

As it relates to injuries, the Consolidated Complaint contains allegations specific to each Plaintiff. Harris says she suffered injuries in the form of loss of privacy, "damages to and diminution in the value of her Private Information," "imminent and impending injury" from the heightened risk of fraud, identity theft, and/or misuse, and the loss of time spent dealing with data breach issues. (Id., ¶¶ 117, 122–25.) Plaintiffs Rebecca Oberdorf, Michael Prins, and Jennifer Medenblik say they suffered essentially the same forms of injury, as well as anxiety. (Id., ¶¶ 130–37, 141–49, 152–59.) They also "anticipate[] spending considerable time and money on an ongoing basis to try to mitigate and address the many harms caused by the Data Breach." (Id., ¶¶ 138, 149, 160.) Plaintiff Jeremy Shine alleges similar forms of injury, although he says he has suffered "stress, fear, and anxiety" at a magnified level because his "Social Security number and name were exposed together, meaning third parties are more likely to access his financial accounts." (Id., ¶ 173.) Shine also alleges that he "has received notifications that his information was shared on the dark web on at least 12 occasions," "has seen fraudulent vehicles on his credit report," and "saw [that] a third party attempted to obtain a new line of credit through [his] credit card account." (Id., ¶¶ 168–70.)

Plaintiffs bring the following claims: <u>Count I</u>: Negligence; <u>Count II</u>: Negligence Per Se; <u>Count III</u>: Breach of Contract; <u>Count IV</u>: Breach of Implied Contract; <u>Count V</u>: Unjust Enrichment; <u>Count VI</u>: Breach of Confidence; <u>Count VII</u>: Breach of Fiduciary Duty; and <u>Count VIII</u>: Declaratory and Injunctive Relief. MercyOne moves to dismiss for lack of standing and on the merits. (ECF 33.) Additional allegations from the Consolidated Complaint will be discussed in context, below.

## II.     LEGAL BACKGROUND AND STANDARDS.

### A.  Motion to Dismiss.

MercyOne moves to dismiss Plaintiffs' Consolidated Complaint under Fed. R. Civ. P. 12(b)(1) and 12(b)(6). In its Rule 12(b)(1) motion, MercyOne alleges the Court lacks subject matter jurisdiction because Plaintiffs do not have standing. To establish standing, "a plaintiff must present a 'case' or 'controversy' within the meaning of Article III of the Constitution." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 591 (8th Cir. 2009). "This 'irreducible constitutional minimum of standing' requires a showing of 'injury in fact' to the plaintiff that is 'fairly traceable to the challenged action of the defendant,' and 'likely [to] be redressed by a favorable decision.'" *Id.* (alteration in original) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). "Whether a plaintiff has shown such an injury 'often turns on the nature and source of the claim asserted.'" *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)). "[T]he question whether he has a cognizable injury sufficient to confer standing is closely bound up with the question of whether and how the law will grant him relief." *Id.*

The Court's analysis of Plaintiffs' standing is wholly separate from its analysis of whether Plaintiffs have stated a plausible claim. *See Campbell v. Minneapolis Pub. Hous. Auth. ex rel. City of Minneapolis*, 168 F.3d 1069, 1074 (8th Cir. 1999) ("We repeat the fundamental principle that the ultimate merits of the case have no bearing on the threshold question of standing."). "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Rydholm v. Equifax Info. Servs. LLC*, 44 F.4th 1105, 1108 (8th Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "The plausibility standard requires a plaintiff to show at the pleading stage that success on the merits is more than a 'sheer possibility.'" *Braden*, 588 F.3d at 594 (quoting *Iqbal*, 556 U.S. at 678). In determining plausibility, the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847,

850 (8th Cir. 2012) (per curiam). The Court is not obligated to accept legal conclusions, however, and "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *United States ex rel. Ambrosecchia v. Paddock Lab'ys, LLC*, 855 F.3d 949, 955 (8th Cir. 2017) (alteration in original) (quoting *Iqbal*, 556 U.S. at 678).

## III.   LEGAL ANALYSIS.

### A.   *All Plaintiffs Have Standing to Bring Contract and Unjust Enrichment Claims, but Only Plaintiff Shine Has Standing to Bring Tort Claims.*

MercyOne argues that Plaintiffs' claims should be dismissed in their entirety for lack of standing because Plaintiffs have alleged only a fear of *future* injury, rather than a *current* injury. MercyOne's argument emanates from the Eighth Circuit's decisions in a case involving a data breach at hundreds of retail grocery stores in which hackers accessed customer financial information. *See In re SuperValu, Inc.*, 870 F.3d 763 (8th Cir. 2017) ("*In re SuperValu I*"); *In re SuperValu, Inc.*, 925 F.3d 955 (8th Cir. 2019) ("*In re SuperValu II*"). In *In re SuperValu I*, the Eighth Circuit affirmed the dismissal of the claims of fifteen of the sixteen plaintiffs for lack of standing because those plaintiffs failed to plausibly allege a "substantial risk" of future injury. 870 F.3d at 770–72. The Eighth Circuit held that the risk of identity theft was not "substantial" because a report from the Government Accountability Office ("GAO"), cited in the plaintiffs' complaint, said access to credit or debit card information generally is not enough in and of itself to cause unauthorized accounts to be opened. *Id.* at 770. The Court further held that the plaintiffs did not state a plausible claim of current injury based on their allegation, "on information and belief," that websites were selling their financial information to third parties. *Id.* This allegation was "speculative" and did not state an injury "to the plaintiff[s]." *Id.* (alteration in original) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). Finally, *In re SuperValu I* held that the time and costs incurred by plaintiffs to mitigate the risk of identity theft did not constitute an injury-in-fact because the underlying risk of identity theft was not substantial. *Id.*

Only one plaintiff in *In re SuperValu I* was held to have standing: a customer who alleged that he suffered a fraudulent charge on a credit card that had been compromised by the data breach. *Id.* at 772. The Eighth Circuit concluded that this plaintiff alleged an injury-in-fact because the misuse of his card was a form of identity theft, which is a cognizable injury for standing purposes. *Id.* The Eighth Circuit declined, however, to decide whether that plaintiff stated a plausible claim

for relief for purposes of Fed. R. Civ. P. 12(b)(6), instead remanding for the district court to decide that issue in the first instance. *Id.* at 773–74. On remand, the district court concluded he had not stated a plausible claim for relief and therefore dismissed the case. *See In re Supervalu II*, 925 F.3d at 966. The Eighth Circuit affirmed. *See id.*

For reasons set forth below, the Court concludes that *In re Supervalu I* requires dismissal of the non-contract claims brought by Plaintiffs Harris, Oberdorf, Prins, and Medenblik for lack of standing pursuant to Fed. R. Civ. P. 12(b)(1). By contrast, Plaintiff Shine has standing for those claims. All Plaintiffs have standing to bring claims for breach of contract and unjust enrichment.

> 1. Plaintiffs Harris, Oberdorf, Prins, and Medenblik Have Not Alleged a Substantial Risk of Future Injury and Thus Lack Standing for Their Non-Breach of Contract Claims.

There are similarities between the Consolidated Complaint here and the claims of the fifteen plaintiffs who lacked standing in *In re SuperValu I*. Like those fifteen plaintiffs, Plaintiffs Harris, Obderdorf, Prins, and Medenblik largely allege harm in the form of prospective measures to address possible *future* injury; i.e., out-of-pocket expenses, loss of time, and other harm resulting from the future risk of fraud, identity theft, and/or other misuse of their private information. They also allege loss of privacy, diminution in value, and anxiety relating to the same future risk. *In re SuperValu I* teaches that these Plaintiffs have standing only if there is a "substantial risk" of such future harm. 870 F.3d at 771–72.

Plaintiffs argue that they have sufficiently pled a "substantial risk" of future injury because the compromised information in the MercyOne data breach included personal identifiers like social security numbers, birth dates, and driver's license numbers, whereas the data breach in *In re SuperValu I* involved only the loss of credit and debit card information. *Id*. at 770. As credit and debit card information generally cannot be used by itself to open unauthorized new accounts, *In re SuperValu I* held that there was not a substantial risk of identity theft. *Id.* at 770–71. Here, by contrast, some courts have held there is a "higher risk of identity theft" when social security numbers and other personal identifiers are compromised. *Coffey v. OK Foods Inc.*, No. 2:21-CV-02200, 2022 WL 738072, at *3 (W.D. Ark. Mar. 10, 2022) (denying motion to dismiss).

Plaintiffs' argument highlights a split that has arisen among district courts in the Eighth Circuit in the aftermath of *In re SuperValu I.* Several district courts have distinguished *In re Supervalu I* and denied motions to dismiss for lack of standing when the plaintiffs alleged that

their social security numbers were compromised in a data breach. *See id.*; *see also Perry v. Bay & Bay Transp. Servs., Inc.*, 650 F. Supp. 3d 743, 751 (D. Minn. 2023) (distinguishing *In re SuperValu I* because the compromised information "included information such as social security numbers, which could ostensibly result in opening unauthorized accounts"); *Weisenberger v. Ameritas Mut. Holding Co.*, 597 F. Supp. 3d 1351, 1359 (D. Neb. 2022) (similar); *In re Pawn Am. Consumer Data Breach Litig.*, 21-CV-2554 (PJS/JFD), 2022 WL 3159874, at *3–4 (D. Minn. Aug. 8, 2022) (similar). By contrast, at least one district court has held that dismissal for lack of standing was appropriate in light of *In re SuperValu I* and similar cases even when the compromised information included social security numbers. *See Wilson v. J.B. Hunt Transp., Inc.*, No. 5:21-CV-5194, 2022 WL 20273042, at *4–6 (W.D. Ark. Oct. 6, 2022). *In re SuperValu I* itself directs that the outcome of a motion to dismiss for lack of standing "turn[s] on the substance of the allegations before each court." *See* 870 F.3d at 769 (declining to reconcile arguably conflicting out-of-circuit precedent "because the cases ultimately turned on the substance of the allegations before each court"). Consistent with this directive, the Court will not apply a categorical rule about whether breaches involving social security numbers and other personal identifiers automatically give rise to a substantial risk of future harm; instead, the Court will look at what the Consolidated Complaint actually alleges.

As to Harris, Oberdorf, Prins, and Medenblik, the relevant allegations include the following: (i) identity theft in the healthcare industry is expensive to remedy when it occurs (ECF 32, ¶¶ 45–46); (ii) identity thieves steal information for the purpose of monetizing it, which can be done with as little as a name and date of birth (id., ¶¶ 88–90); (iii) identity thieves can use social security numbers and personal health information to commit a variety of fraud-related crimes, including accessing existing accounts, opening fraudulent new accounts, obtaining government benefits or tax refunds, or otherwise using someone else's identity for fraudulent purposes (id., ¶¶ 91–99); (iv) personal health information is particularly valuable to identity thieves and can be used "to commit an array of crimes, including identity theft and medical and financial fraud" (id., ¶ 95); and (v) the Federal Trade Commission ("FTC") recommends that consumers "take several time-consuming steps to protect their personal and financial information after a data breach," including contacting credit bureaus, reviewing credit reports, contacting companies to remove fraudulent charges from their accounts, and similar steps (id., ¶ 92). These four Plaintiffs also make a variety of other allegations relating to injuries, including that they "suffered a loss of value of their

[personal information] when it was acquired by cyber thieves in the Data Breach" (id., ¶ 113) and "have suffered or will suffer actual injury . . . in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach" (id., ¶ 115). Similarly, but more specifically, these Plaintiffs allege injury in the form of loss of privacy, diminution in value of personal information, anxiety, and loss of time spent dealing with data breach issues. (Id., ¶¶ 122–25, 130–37, 141–49, 152–59.)

There are two noticeable omissions from the injury-related allegations by Plaintiffs Harris, Oberdorf, Prins, and Medenblik. First, none of them allege that they *actually* spent money as a result of the data breach; instead, at most, they vaguely allege that they "have suffered **or** will suffer actual injury . . . in the form of out-of-pocket expenses and the value of their time." (Id., ¶ 115 (emphasis added).) Their failure to unambiguously allege any out-of-pocket expenses casts doubt on whether they have met their burden of plausibly stating the existence of a substantial risk of future injury; presumably, a person who genuinely perceives such risk already would have incurred *some* out-of-pocket cost to ameliorate it. *See Pratt v. Helms*, 73 F.4th 592, 594 (8th Cir. 2023) ("The plaintiff bears the burden to allege an injury in fact, causation, and redressability."), *cert. denied*, 144 S. Ct. 567 (2024); *cf. In re Supervalu I*, 870 F.3d at 770 (concluding that "on information and belief" allegations about misuse of financial information were too speculative to state a claim).

Second, although the Consolidated Complaint extensively cites and discusses various laws, regulations, and reports regarding identity theft—including, e.g., FBI reports, warnings from the American Medical Association, FTC guidelines, HIPAA, and various online publications—nothing in the pleading describes what these resources say about the *likelihood* of identity theft after a data breach. Instead, at most, the Consolidated Complaint contains allegations about the *costs* associated with identity theft *when it happens*. (E.g., ECF 32, ¶¶ 45–46, 94, 99–100.) This is akin to talking about the *costs* associated with a meteor hitting your home, which are enormous, versus the *likelihood* of such an event, which is not. In these circumstances, the Court concludes that *In re SuperValu I* requires dismissal for lack of standing of the non-contract claims brought by Plaintiffs Harris, Oberdorf, Prins, and Medenblik. *See* 870 F.3d at 770–71. These Plaintiffs have not plausibly alleged a "substantial risk" of future injury.

In reaching this conclusion, the Court is not disregarding the fact that *In re Supervalu I* merely involved the loss of credit and debit card information, whereas the Consolidated Complaint

here also involves the loss of personally identifying information like social security numbers and birth dates. The Court simply concludes that this is not an outcome-determinative distinction. The key to this conclusion is a 2007 Government Accountability Office ("GAO") Report, which is featured prominently in *In re SuperValu I* and also referenced in paragraph 102 of the Consolidated Complaint here. (ECF 32, ¶ 102 (citing U.S. Gov't Accountability Off., GAO-07-737, *Personal Information: Data Breaches are Frequent, But Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown* (2007), http://www.gao.gov/assets.270/262899.pdf) (hereinafter, the "GAO Report").) As the Eighth Circuit recognized in *In re SuperValu I*, the GAO Report concluded that "most [data] breaches have not resulted in detected incidents of identity theft." 870 F.3d at 771 (quoting the GAO Report, p. 21). In affirming dismissal for lack of standing, *In re SuperValu I* relied heavily on this conclusion, as well as the Report's related statement that only three of the largest data breaches between January 2000 and June 2005 appeared to result in "account fraud" of the type the fifteen plaintiffs claimed was imminent. *Id.* (citing GAO Report, pp. 24–25.)

The GAO Report's conclusion that "most [data] breaches have not resulted in detected incidents of identity theft" is just as relevant here as it was in *In re SuperValu I*. The GAO Report was not isolated to data breaches involving lost credit or debit card information; rather, it analyzed *all* types of data breaches, most of which, according to the Report, involved "compromised data that included personally identifiable information." GAO Report, p. 5.[3] The GAO Report therefore speaks directly to the type of data breach at issue in the Consolidated Complaint. It follows that this Court must place just as much weight on the GAO Report as *In re SuperValu I* did; which is to say, the Court should conclude, in the absence of contrary information in the Consolidated Complaint, that most data breaches do not result in identity theft even when they involve personal identifiers like social security numbers. *See* GAO Report, pp. 24–25.

If anything, the GAO Report weighs even more strongly against standing here than it did in *In re SuperValu I*. Plaintiffs argue that the "theft of sensitive static PII (like a combination of names, dates of birth, health information, and Social Security numbers)" creates a higher risk of identity theft than "a breach involving the mere theft of payment card data." (ECF 38, pp. 7–8.) In

---

[3] Elsewhere, the GAO Report explains that "personally identifiable information" refers to "any information that can be used to distinguish or trace an individual's identity—such as name, Social Security number, driver's license number, and mother's maiden name." *Id.*, p. 2, n.2.

other words, Plaintiffs are essentially arguing that the *real* risk in data breach situations is that a fraudster will use someone else's identity to open accounts, obtain government benefits, or otherwise defraud government and private actors. (E.g., ECF 32, ¶¶ 91, 93.) The GAO Report refutes this argument:

> Many of the law enforcement officials said that, based on their experience, data breaches that result in harm have usually involved fraud on existing accounts (such as credit card fraud) rather than the unauthorized creation of new accounts. Secret Service representatives noted that using illicit credit and debit card numbers and bank account information is much easier and less labor intensive than using personally identifiable information to fraudulently open new accounts. Officials at Secret Service, FBI, and [United States Postal Inspection Service] all said that identity theft involving the creation of new accounts often results not from data breaches, but from other sources, such as retrieving personal information by sifting through a family's household trash.

GAO Report, p. 22. This means, according to the GAO Report, that cases like *In re SuperValu I* represent the high water mark for risks associated with a data breach because existing credit card numbers were stolen. Yet the Eighth Circuit still held the risks were not substantial enough to satisfy Article III. It follows that the Consolidated Complaint here—which revolves around less common forms of harm like using identity theft to open new accounts or obtain government benefits—also falls short of the mark.

A different section of the GAO Report reinforces this conclusion. The Report summarizes the results of a survey of forty-six hospitals, which, collectively, reported seventeen data breaches for a multi-year period starting in 2003. *See* GAO Report, p. 23. Of those seventeen data breaches, "three had resulted in fraudulent activity on existing accounts and another three resulted in other forms of identity theft, including one case where the information was used to file false income tax refunds. The identity theft in these cases involved small numbers of victims—usually just one." *Id.* The takeaway from this portion of the GAO Report—which, importantly, involves the healthcare industry, just like the Consolidated Complaint—is that the likelihood of any particular patient experiencing identity theft after a data breach like the one at MercyOne is incredibly low. *See In re SuperValu I*, 870 F.3d at 771 (relying on a similar survey of twenty-four large data breaches to conclude there was not a "substantial risk" of injury to the plaintiffs).

It is worth noting that *In re SuperValu I* left open the possibility that there be additional data available in future cases that would yield "more detailed factual support for plaintiffs' allegations of future injury. But such support is absent from the complaint here, and a mere

possibility is not enough for standing." *Id.* The same is true here. If the GAO Report is outdated or obsolete, one would have expected the Consolidated Complaint to say so. It does not; instead, as noted above, it focuses on the *costs* of identity theft rather than the *likelihood* of it occurring in the first place. Plaintiffs Harris, Oberdorf, Prins, and Medenblik do not have standing in these circumstances based on the risk of future injury.

Finally, the Court rejects the alternative argument made by Plaintiffs Harris, Oberdorf, Prins, and Medenblik that they have standing based on the "loss of privacy" they allegedly experienced due to the data breach. At the outset, this argument is somewhat difficult to understand and apply in the context of Iowa law because the Iowa Supreme Court has recognized four traditional types of invasion of privacy claims: (1) "unreasonable intrusion upon seclusion"; (2) "appropriation of the other's name or likeness"; (3) "unreasonable publicity given to the other's private life"; and (4) "publicity that unreasonably places the other in a false light before the public." *Koeppel v. Speirs*, 808 N.W.2d 177, 181 (Iowa 2011). Plaintiffs are not bringing any of these claims, and it seems odd to find standing based on an "injury" that does not match the substantive causes of action.

Nonetheless, Plaintiffs' position finds support from out-of-circuit precedent. In *Bohnak v. Marsh & McLennan Cos., Inc.*, the Second Circuit held that standing existed in a data breach case based on the exposure of the plaintiff's private information to unauthorized third parties. 79 F.4th 276, 285 (2d Cir. 2023). *Bohnak* explained that the Supreme Court "specifically recognized that 'disclosure of private information' was an intangible harm 'traditionally recognized as providing a basis for lawsuits in American courts.'" *Id.* at 286 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021)). It did not matter in *Bohnak* that the plaintiffs were not bringing traditional invasion of privacy tort claims, or even whether governing state law would allow such claims at all. *Id.*

It is unclear whether the Eighth Circuit would endorse *Bohnak*'s reasoning. In *In re Supervalu I*, the Eighth Circuit stated in a footnote that the plaintiffs did not pursue an invasion-of-privacy theory of standing on appeal, and thus the Eighth Circuit did not address it. *See* 870 F.3d at 771 n.5. The original district court decision in the case, however, did evaluate such an argument, concluding it lacked merit. *See In re Supervalu, Inc.*, No. 14-MD-2586 ADM/TNL, 2016 WL 81792, at *8 (D. Minn. Jan. 7, 2016) ("Plaintiffs have not alleged facts showing that the loss of privacy and confidentiality resulted in a concrete injury. Therefore, this theory of standing

also fails."), *aff'd in part, rev'd in part and remanded*, 870 F.3d 763. The Eastern District of Missouri reached the same conclusion in a similar case, stating that "loss of privacy and breach of confidentiality are too abstract to establish Article III standing." *Duqum v. Scottrade, Inc.*, No. 4:15-CV-1537-SPM, 2016 WL 3683001, at *8 (E.D. Mo. July 12, 2016), *aff'd sub nom. Kuhns v. Scottrade, Inc.*, 868 F.3d 711 (8th Cir. 2017); *see also In re Zappos.com, Inc.*, 108 F. Supp. 3d 949, 954 (D. Nev. 2015) (dismissing for lack of standing despite allegations of loss of privacy). The Court finds these decisions persuasive and therefore concludes that Harris, Oberdorf, Prins, and Medenblik do not have standing to bring non-contract claims based on their alleged loss of privacy injuries because the loss of privacy is premised on the improper future use of their personal information, and there is no "substantial risk" of this happening. (The Court notes, in any event, that even if the alleged invasion of privacy injuries are sufficient to give standing to these Plaintiffs, their tort claims would fail on the merits for the reasons described in Section III.B, below, in connection with Plaintiff Shine.)

2.  <u>Plaintiff Shine Has Standing to Bring Non-Contract Claims.</u>

Plaintiff Shine is situated differently than his co-Plaintiffs because he alleges that he "has received notifications that his information was shared on the dark web on at least 12 occasions," "has seen fraudulent vehicles on his credit report," and "saw a third party attempted to obtain a new line of credit through [his] credit card account." (ECF 32, ¶¶ 168–70.) Shine is therefore akin to the one plaintiff (out of sixteen) in *In re Supervalu I* who had standing based on that plaintiff's allegation that his credit card information was actually misused following the data breach. 870 F.3d at 772. As to that one plaintiff, standing existed because of a "present injury in fact." *See id.* For the same reason, Shine has standing here. *See id.*

In arguing otherwise, MercyOne relies heavily on *In re Supervalu II* for the proposition that Shine's putative injuries are not compensable under governing law. (ECF 33-1, pp. 9–11.) This reliance is misplaced because *In re Supervalu II* was analyzing the merits of the surviving plaintiff's claims under Fed. R. Civ. P. 12(b)(6), not standing under Fed. R. Civ. P. 12(b)(1). 925 F.3d at 964–65. The Court likewise rejects MercyOne's argument that Shine lacks standing based on his alleged failure to establish a plausible causal connection between the data breach and the misuse of his data. The Eighth Circuit rejected a similar argument in *In re Supervalu I*, explaining that general allegations regarding causation were sufficient for standing purposes to state a causal connection between the data breach and the plaintiff's present injury. 870 F.3d at 772. This result

was unchanged, the Eighth Circuit explained, by the alleged infrequency of misuse following data breach incidents. *See id.* at 772–73. So long as the plaintiff alleged an actual, present injury caused by the data breach, standing existed. *See id.* This analysis squarely applies here and defeats MercyOne's argument that Plaintiff Shine lacks standing.

3. <u>All Five Plaintiffs Have Standing to Bring Breach of Contract and Unjust Enrichment Claims</u>

Eighth Circuit precedent is also squarely on point as it relates to the standing of all five Plaintiffs to bring breach of contract and unjust enrichment claims. In *Kuhns v. Scottrade, Inc.*, the Eighth Circuit held that standing exists when a defendant is alleged to have breached a contract by failing to provide promised data privacy safeguards, as there is a concrete injury in the form of "the diminished value of [the plaintiff]'s bargain." 868 F.3d at 716. Similarly, in *Carlsen v. GameStop, Inc.*, the Eighth Circuit held that a party who alleges breach of contract "has a judicially cognizable interest for standing purposes, regardless of the merits of the breach alleged." 833 F.3d 903, 909 (8th Cir. 2016). Following *Kuhns* and *Carlsen*, the Court concludes that all five Plaintiffs have standing to pursue their breach of contract and unjust enrichment claims. This does not mean, however, that these claims satisfy Fed. R. Civ. P. 12(b)(6) on the merits. *See, e.g.*, *Kuhns*, 868 F.3d at 717–19 (dismissing claims on the merits despite concluding the plaintiff had standing). The merits will be discussed in Section III.B, below.

4. <u>Summary: Standing.</u>

All five Plaintiffs have standing to bring claims for breach of contract and unjust enrichment. Only Plaintiff Shine has standing to bring claims for negligence, negligence per se, breach of confidence, and breach of fiduciary duty.

B. *To the Extent They Have Standing, Plaintiffs Have Largely Failed to State Plausible Claims for Relief.*

1. <u>Plaintiffs Do Not Have Viable Claims for Breach of Express Contract.</u>

The Court will start with the merits of the breach of express contract claim, which all five Plaintiffs have standing to bring. To state a claim for breach of an express contract, each Plaintiff must show: "(1) the existence of a contract; (2) the terms and conditions of the contract; (3) that [Plaintiff] has performed all the terms and conditions required under the contract; (4) the defendant[] breach[ed] . . . the contract in some particular way; and (5) that [P]laintiff has suffered damages as a result of the breach." *Iowa Arboretum, Inc. v. Iowa 4-H Found.*, 886 N.W.2d 695, 706 (Iowa 2016).

Plaintiffs allege the existence of two express contracts with MercyOne. First, they allege a contract "through which they paid money to MercyOne in exchange for services" and MercyOne, in turn, promised "to secure, safeguard, and not disclose . . . Private Information." (ECF 32, ¶ 224.) Second, they allege that MercyOne has a Privacy Policy, which "became part of the agreement for services" and included MercyOne's promise to "never share" Private Information "except under limited circumstances." (Id., ¶¶ 225–26.)[4] Plaintiffs allege MercyOne breached both agreements by failing to safeguard their Private Information. (Id., ¶¶ 228–29.)

As was the case with standing, there is Eighth Circuit precedent almost directly on-point regarding the merits of Plaintiffs' breach of contract claims. In *Kuhns*, the plaintiff alleged that Scottrade breached its Brokerage Agreement—which included, as Addendum 2, a "Privacy Policy and Security Statement"—by failing to provide sufficient security measures to protect the plaintiff's data. 868 F.3d at 717. In *Carlsen*, the plaintiff alleged that GameStop violated its terms of service—which included a privacy policy—by sharing his personally identifiable information with Facebook. 833 F.3d at 911. Both claims failed. In *Kuhns*, this was because the plaintiff's claim was based on Scottrade's covenant to "protect your personal information" and "use security measures that comply with federal law," but plaintiff failed to "identify a single 'applicable law and regulation' that Scottrade allegedly breached." 868 F.3d at 717. The Eighth Circuit refused to read in a covenant that "customer data would not be hacked" or speculate about how, in absence of specific allegations, Scottrade could have maintained better security measures to prevent a breach. *Id*. Without more specific allegations, the Eighth Circuit concluded the complaint did "not assert more than the mere possibility of misconduct: it is possible that Scottrade breached the Brokerage Agreement, but we have no idea how." *Id*. The claim in *Carlsen* failed for a different reason, which was that the terms of service did not include the plaintiff's Facebook ID or browsing history in its list of personal information (nor did GameStop solicit it), so "the protection [plaintiff] argue[d] GameStop failed to provide was not among the protections for which he bargained by agreeing to the terms of service, and GameStop thus could not have breached its contract with [him]." 833 F.3d at 912.

---

[4] The Consolidated Complaint contains a link to the "Privacy Policy," which, at least at the time of this Order, was the HIPAA Policy MercyOne maintains on its website. (ECF 32, ¶ 29 (citing https://www.mercyone.org/for-patients/hipaa-policy).)

Plaintiffs here start a step behind the plaintiffs in *Kuhns* and *Carlsen* because there is no written services agreement at all, much less one that explicitly wraps in the Privacy Policy. That's fatal to their breach of contract claim insofar as it arises out of the theory that paying money to MercyOne for services created an express contractual relationship regarding data privacy. *See Gillis v. Principia Corp.*, 832 F.3d 865, 874 (8th Cir. 2016) (holding that plaintiff had no breach of contract claim because he could not identify written language that "create[d] obligations that [defendant] owed to [him]."); *see also Foster v. Health Recovery Servs., Inc.*, 493 F. Supp. 3d 622, 640–41 (S.D. Ohio 2020) (dismissing breach of contract claim for the "protection of . . . health information" where plaintiffs did not attach the agreement or specify what provisions were breached). Even granting all reasonable inferences in their favor, Plaintiffs' allegations are not sufficient to plausibly establish that MercyOne assented to individual patient contracts for data security. *See id.* Moreover, even if Plaintiffs had alleged mutual assent, they have not alleged the existence of an enforceable term that would apply here, such as an allegation that "customer data would not be hacked." *Kuhns*, 868 F.3d at 717 (dismissing similar breach of contract claim).

Plaintiffs' other theory—that the Privacy Policy itself is an express contract—also fails. Granted, it is in writing, but the closest it comes to creating an enforceable contractual obligation is promising to comply with HIPAA. This is not enough to state a plausible claim for relief, as breach of contract claims generally cannot arise out of statutory obligations. *See Astra USA, Inc. v. Santa Clara Cnty., Cal.*, 563 U.S. 110, 118 (2011) (no breach of contract action where the "statutory and contractual obligations . . . are one and the same"). This is particularly true when, as here, the statute MercyOne "promised" to comply with does not create a private right of action. *See Dodd v. Jones*, 623 F.3d 563, 569 (8th Cir. 2010) (recognizing that HIPAA did not create a private right of action). In essence, Plaintiffs are trying to "mask a HIPAA claim as a breach of contract claim." *Brush v. Miami Beach Healthcare Grp. Ltd.*, 238 F. Supp. 3d 1359, 1368 (S.D. Fla. 2017). This is not a viable theory of recovery. *See id.* (dismissing breach of contract claim based on HIPAA Notice of Privacy Practices); *Cairel v. Jessamine Cnty. Fiscal Ct.*, No. 5:15-CV-186-JMH, 2015 WL 8967884, at *4 (E.D. Ky. Dec. 15, 2015) ("Plaintiff attempts to circumvent the fact that no private right of action exists under HIPAA by characterizing her claim thereunder as one for breach of contract. Regardless of whether the contract included a HIPAA provision, there simply is no private right of action for violations of HIPAA, at the state or federal level."); *In re Mednax Servs., Inc., Customer Data Sec. Breach Litig.*, 603 F. Supp. 3d 1183, 1222 (S.D.

Fla. 2022) ("Because Defendants are required by law to adhere to HIPAA without receiving any consideration from Plaintiffs or any other patient, these provisions cannot create contractual obligations.").

As neither MercyOne's provision of services nor its Privacy Policy created an express contract with Plaintiffs, the Court GRANTS MercyOne's Motion to Dismiss Count III as to all five Plaintiffs.

2.   <u>Plaintiffs Do Not Have Viable Claims for Breach of Implied Contract.</u>

As an alternative to their breach of express contract claims, Plaintiffs allege that an implied contract was created when they provided MercyOne with Private Information and money in exchange for medical services. Under Iowa law, implied contracts exist if the parties' conduct— as opposed to words—demonstrate a "a mutual manifestation of assent . . . to the same terms." *Larew v. Hope L. Firm, P.L.C.*, 977 N.W.2d 47, 56 (Iowa 2022) (citations omitted). "Mutual assent is ordinarily manifested through offer and acceptance, within our contract principles." *Rucker v. Taylor*, 828 N.W.2d 595, 602 (Iowa 2013). Aside from the difference in how the parties manifest assent, there is "no difference in legal effect" between an express and implied contract. *Id.* at 601– 02 (quoting Restatement (Second) of Contracts § 4 cmt. a at 14). However, "[t]here can't be an implied contract when there is an express contract." *Larew*, 977 N.W.2d at 57; *see also Rucker* 828 N.W.2d at 602. ("A contract may be express *or* implied." (emphasis added)).

In Plaintiffs' view, the relationship between themselves and MercyOne necessarily included MercyOne's promise to "securely maintain and store their Private Information." (ECF 32, ¶¶ 236–40.) Plaintiffs list various obligations MercyOne undertook in the implied arrangement, including, but not limited to, promising to restrict access to Private Information, implementing appropriate retention policies, requiring encryption and multifactor authentication for access, and taking other steps to prevent "foreseeable data breaches." (Id., ¶ 241.) Plaintiffs allege that MercyOne breached the implied contract by failing to employ adequate security measures to prevent unauthorized access to their Private Information. (Id., ¶¶ 245–55.)

Plaintiffs' breach of implied contract claim is a better fit for the facts than their breach of express contract claim, as some courts have concluded that the provision of medical services, by itself, creates an implied contract for the protection of personal information. *See Charlie v. Rehoboth McKinley Christian Health Care Servs.*, 598 F. Supp. 3d 1145, 1165 (D.N.M. 2022) ("Numerous courts, however, have found that when the provider of goods or services requires a

16

purchaser to furnish private information as a prerequisite to providing the goods or service, an implied contract to protect that private information is formed."). Other courts disagree. *See Brush*, 238 F. Supp. 3d at 1369 (holding plaintiff "transacted to receive healthcare services from the Defendants—not data security services beyond the privacy requirements already imposed on the Defendants by federal law"). The Court need not weigh in on this issue because *Kuhns* and *Carlson* require dismissal of Plaintiffs' implied contract claims for a different reason.

Read together, *Kuhns* and *Carlson* require alleged victims of a data breach to do two things to successfully bring a breach of implied contract claim. First, the plaintiffs must allege that the defendant promised to protect the *specific* piece of data the plaintiffs assert was accessed. *Carlsen*, 833 F.3d at 911 (rejecting claim where privacy policy "unambiguously d[id] not include" the pieces of breached information, meaning it was "not among the protections for which [plaintiff] bargained"). Second, even if the implied contract covers the specific data, the plaintiff must allege something beyond a mere implicit promise to protect it from unauthorized use or comply with data security laws. *Kuhns*, 868 F.3d at 717. In other words, the plaintiff must identify the actions (e.g., security measures or procedures) the defendant could have employed to prevent the breach. *Id.* Otherwise, unless the defendant "affirmatively promise[s] that its customer data would not be hacked," the complaint "does not assert more than the mere possibility of misconduct: it is possible that [the defendant] breached the [agreement], but we have no idea how." *Id.* The "implied promise that because data was hacked [the defendant]'s protections must have been inadequate" cannot survive a motion under Fed. R. Civ. P. 12(b)(6). *Id.*

Count IV of Plaintiffs' Consolidated Complaint does exactly what *Kuhns* says is insufficient to state a claim. Even assuming the existence of an implied contract that encompassed the Private Information—which is debatable, at best, under *Carlsen* and basic Iowa contract law principles requiring "sufficiently definite" terms with "precise meaning," *see Konchar v. Pins*, 989 N.W.2d 150, 158 (Iowa 2023)—Plaintiffs do not specify how the implied contract was breached. The Consolidated Complaint talks at length about how MercyOne *might have* protected the information, but it does not say which failure caused the unauthorized access or which security feature would have prevented it. (ECF 32, ¶¶ 69, 83, 241.) Plaintiffs' reliance on federal regulations doesn't help, either, as those regulations merely recite basic tenets of cybersecurity such as implementing policies and procedures to prevent security violations without factual context for where MercyOne went wrong. (Id., ¶¶ 246–54.)

Since the Court cannot imply a promise that Plaintiffs' "customer data would not be hacked," Plaintiffs must allege more than a "mere possibility of misconduct." *Kuhns*, 868 F.3d at 717. They haven't done so. In fact, they've done the opposite. They state that "it can be *inferred* from MercyOne's Data Breach that MercyOne either failed to implement, or inadequately implemented, information security policies or procedures to protect Plaintiffs' and Class Members' PHI." (ECF 32, ¶ 58; *see also* ¶ 79 ("As *evidenced by* the Data Breach, Defendants failed to follow some or all of these cybersecurity practices.") (emphasis added).) This is exactly the "implied premise that because data was hacked, [the defendant]'s protections must have been inadequate" that *Kuhns* instructs is insufficient. 868 F.3d at 717. The Court therefore GRANTS MercyOne's Motion to Dismiss Count IV as to all five Plaintiffs.

### 3. Plaintiffs Do Not Have Viable Claims for Unjust Enrichment.

Finally, as an alternative to both the express and implied contract theories, Plaintiffs assert that MercyOne was unjustly enriched when it kept Plaintiffs' payments for medical services—which allegedly encompassed payments for cybersecurity protection—despite failing to provide adequate security measures to protect their Private Information. (ECF 32, ¶¶ 260–64.) Plaintiffs do not allege that cybersecurity protection was a line-item on their medical bills, but rather that MercyOne funds its data security measures entirely from its general revenue, which includes payments Plaintiffs provided for medical services. (Id., ¶ 261.)

"Unjust enrichment exists when (1) one party is enriched (2) at the expense of the other, and (3) it would be unjust under the circumstances for the enriched party to retain the benefit." *MidWestOne Bank v. Heartland Co-op*, 941 N.W.2d 876, 886 (Iowa 2020). It "is a broad principle with few limitations." *Endress v. Iowa Dep't of Hum. Servs.*, 944 N.W.2d 71, 80 (Iowa 2020) (citation omitted). Where the parties dispute the existence and terms of a contract, a plaintiff may plead unjust enrichment in the alternative to their breach of contract claim. *See Meardon v. Register*, 994 F.3d 927, 936 (8th Cir. 2021).

Plaintiffs' unjust enrichment claim runs headlong into *Carlsen*, which requires that a "specific portion" of the plaintiff's fee "went toward data protection or that [defendant] agreed to provide additional protection to paid [customers] that it did not also provide to non-paid [customers]." 833 F.3d at 912. Plaintiffs have not alleged that MercyOne treats paying and nonpaying patients differently, so the viability of their claim hinges on the first requirement—that is, that a "specific portion" of their payment funded MercyOne's data protection costs. *Id*. Not

only does the Consolidated Complaint not allege this, it actually says the opposite: "Upon information and belief, MercyOne funds its data security measures entirely from its general revenue, including from payments made to it by Plaintiffs . . . [and] [a]s such, a portion of the payments made by Plaintiffs . . . is to be used to provide a reasonable and adequate level of data security . . . and the amount of the portion of each payment made that is allocated to data security to known to MercyOne." (ECF 32, ¶¶ 261–62.) This falls well short of what *Carlsen* requires. *See Carlsen*, 833 F.3d at 912; *see also In re Supervalu II*, 925 F.3d at 966 (rejecting unjust enrichment theory where plaintiff "paid for groceries," not "for a side order of data security and protection" (quotation omitted)).

Because Plaintiffs have not alleged that a specific portion of their payments funded data security, they have not alleged the conferral of a benefit on MercyOne in exchange for protection of their Private Information, much less stated how MercyOne's retention of any such "benefit" would be inequitable. *See Carlsen*, 833 F.3d at 912; *In re Supervalu II*, 925 F.3d at 966; *see also Hall v. Centerspace, LP*, No. 22-CV-2028 (KMM/DJF), 2023 WL 3435100, at *6–7 (D. Minn. May 12, 2023) (relying on *Carlsen* to dismiss unjust enrichment claim where plaintiffs failed to allege they provided defendant an additional benefit in exchange for greater data protection). The Court therefore GRANTS MercyOne's Motion to Dismiss Count V as to all five Plaintiffs.

### 4. Plaintiff Shine Does Not Have a Viable Claim for Breach of Fiduciary Duty or Breach of Confidence.

The Court concluded above that Plaintiffs Harris, Oberdorf, Prins, and Medenblik only had standing to bring breach of contract and unjust enrichment claims, not tort claims. The Court therefore need not analyze the merits of the tort claims as to those Plaintiffs.[5] *See TransUnion*, 594 U.S. at 431 ("[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek. . . ."). By contrast, Plaintiff Shine has standing as to every claim, and thus the Court must analyze the merits of his tort claims, starting with breach of confidence (Count VI) and breach of fiduciary duty (Count VII). Shine alleges that he and his co-Plaintiffs had a "special relationship" with MercyOne by virtue of providing their Private Information in exchange for medical services. (ECF 32, ¶ 282.) As a result, Shine alleges MercyOne "became a fiduciary by its undertaking and guardianship of the Private

---

[5] The Court notes, in any event, that its analysis of the merits of Shine's claims would apply with equal force to the claims of Harris, Oberdorf, Prins, and Medenblik.

Information" and that MercyOne breached its fiduciary duty by, *inter alia*, failing to safeguard Private Information and failing to diligently discover, investigate, and give notice of the data breach. (Id., ¶¶ 283–88.)

To state a claim for breach of fiduciary duty under Iowa law, a plaintiff must allege: "(1) the defendant owed a fiduciary duty to the plaintiff; (2) the defendant breached the fiduciary duty; (3) the breach of fiduciary duty was a proximate cause of damage to the plaintiff; and (4) the amount of damages, if any." *Meardon*, 994 F.3d at 937 (cleaned up, quotation omitted). "A fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Vos v. Farm Bureau Life Ins. Co.*, 667 N.W.2d 36, 52 (Iowa 2003) (quotation omitted). While some relationships "necessarily give rise to a fiduciary relationship," the Court must examine the "facts and circumstances of each individual case" to determine if a fiduciary duty exists. *Id*. Indicia a fiduciary relationship include: "the acting of one person for another; the having and the exercising of influence over one person by another; the reposing of confidence by one person in another; the dominance of one person by another; the inequality of the parties; and the dependence of one person upon another." *Id*. "No one factor is determinative." *Meardon*, 994 F.3d at 937.

The Iowa Supreme Court has sometimes used the word "fiduciary" to describe the relationship between a doctor and patient. In *Baines v. Blenderman*, for example, the Court stated that "[a] physician owes his patient a fiduciary duty. Mutual confidence is essential to proper care of the patient." 223 N.W.2d 199, 202 (Iowa 1974); *see also, e.g.*, *Downing v. Grossmann*, 973 N.W.2d 512, 520 (Iowa 2022) (discussing "[t]he existence of a fiduciary duty, such as that between a physician and his patient"). However, these cases used the word "fiduciary" to decide when a physician's silence about a patient's condition constitutes "fraudulent concealment" for purposes of tolling the statute of repose. *See id.* Similarly, in *Head v. Colloton*, the Iowa Supreme Court described the relationship between a public hospital and patient as a "fiduciary relationship" for purposes of open records laws. 331 N.W.2d 870, 876 (Iowa 1983). The Court does not interpret these decisions as giving patients a freestanding cause of action for breach of fiduciary duty whenever a physician or hospital makes an error or omission that allegedly causes harm. Instead, the Court predicts that the Iowa Supreme Court would recognize a patient as having a claim for breach of fiduciary duty, if at all, only when the claim directly relates to the provision of medical advice or treatment. *See Vos*, 667 N.W.2d at 52 (explaining that a fiduciary owes a duty "for the

20

benefit of another upon matters *within the scope of the relation*" (emphasis added)); *Stender v. Blessum*, 897 N.W.2d 491, 506 (Iowa 2017) (holding that an attorney does not owe fiduciary duties to a client "outside the scope of the attorney-client relationship").

Stated differently, fiduciary relationships typically arise only when one party exercises domination or influence over the other in a way that is atypical of a business relationship. *See Kurth*, 380 N.W.2d at 695. Here, when it comes to medical advice or treatment, Shine plausibly has such a relationship with MercyOne and its physicians; indeed, his desire for medical advice or treatment is presumably why he went to MercyOne in the first place. He did not, however, go to MercyOne for advice regarding the protection of his personal information, nor could he plausibly allege that MercyOne exercised atypical domination or influence over him as to that issue. Instead, the protection of his personal information was a corollary part of his relationship with MercyOne for which the parties operated at arms-length. No fiduciary duty exists in such circumstances. *See Albaugh v. The Rsrv.*, 930 N.W.2d 676, 686 (Iowa 2019) ("[A] fiduciary relationship does not exist when the relationship exists through an 'arms-length transaction.'"); *Blessum*, 897 N.W.2d at 506–07.

Although there is a split of authority, many district courts in other jurisdictions have concluded in similar circumstances that no fiduciary duty exists. *See In re Ambry Genetics Data Breach Litig.*, 567 F. Supp. 3d 1130, 1146 (C.D. Cal. 2021) (holding that no fiduciary duty existed despite patients' provision of private information because medical provider and patients were in an "arms-length business relationship"); *In re Mednax Servs., Inc., Customer Data Sec. Breach Litig.*, 603 F. Supp. 3d 1183, 1226 (S.D. Fla. 2022) (same, no fiduciary duty despite healthcare provider receiving private information because parties were in "arm's-length transaction"); *Weisenberger v. Ameritas Mut. Holding Co.*, 597 F. Supp. 3d 1351, 1367–68 (D. Neb. 2022) (similar, no fiduciary duty between insured and health insurer); *Rodriguez v. Mena Hosp. Comm'n*, No. 2:23-CV-2002, 2023 WL 7198441, at *9–10 (W.D. Ark. Nov. 1, 2023) (dismissing breach of fiduciary duty claim following data breach where plaintiffs' relationship with defendant was a "typical one between patient and healthcare system" and fiduciary law requires "something more"). The Court predicts the Iowa Supreme Court would reach the same conclusion here and therefore GRANTS MercyOne's Motion to Dismiss Count VII.

For essentially the same reasons, the Court concludes that Shine also has not stated a viable claim for breach of confidence. Under Iowa law, breach of confidence is technically distinct from

breach of fiduciary duty, although there is considerable overlap. *See Oehler v. Hoffman*, 113 N.W.2d 254, 256 (1962) ("It is clear [that a confidential relationship] may exist although there is no fiduciary relation."). Like a fiduciary relationship, a "confidential" relationship exists "when one person has gained the confidence of another and purports to act or advise with the other's interest in mind." *Id.* "The gist of the doctrine of confidential relationship is the presence of a dominant influence under which the act is presumed to have been done." *Id.*; *see also Matter of Herm's Est.*, 284 N.W.2d 191, 199 (Iowa 1979) ("A confidential relationship arises whenever a continuous trust is reposed by one person in the skill and integrity of another, and so it has been said that all the variety of relations in which dominion may be exercised by one person fall within the general term 'confidential relation.'").

Shine's relationship with MercyOne is nothing like the relationships the Iowa Supreme Court has evaluated in other cases involving alleged breaches of confidence. *See Oehler*, 113 N.W.2d at 258 (ill grantor and grantee in property dispute, confidential relationship not established); *Matter of Herm's Est.*, 284 N.W.2d at 200 (similar, aunt and nephew, confidential relationship established); *Kunz v. Kunz*, 125 N.W.2d 226, 232 (1963) (similar, mother and son, confidential relationship not established where court found "little more than a normal family relationship"); *McGaffee v. McGaffee*, 56 N.W.2d 36, 39 (1952) (similar, father and son, confidential relationship established), *opinion modified on reh'g*, 58 N.W.2d 357 (1953); *Mendenhall v. Judy*, 671 N.W.2d 452, 460 (Iowa 2003) (similar, mother and daughter, confidential relationship established). Indeed, most Iowa cases examining confidential relationships arise in the context of probate law and, tellingly, the Iowa Supreme Court has relied upon the Restatement of the Law of Trusts in defining such relationships. *See Kunz*, 125 N.W.2d at 228; *McGaffee*, 56 N.W.2d at 39; *see also Judy*, 671 N.W.2d at 455 (explaining that a confidential relationship is "particularly likely to exist where there is a family relationship"). Shine does not allege a family relationship with MercyOne, nor does he state any other facts that would indicate the type of domination or control required under Iowa Supreme Court precedent for "confidential" relationships. Instead, at most, he apparently believes that because he shared "confidential" information with MercyOne, his relationship with MercyOne is "confidential" in the legally relevant sense. His position is not supported by governing law.

The conclusion is the same if Shine's "breach of confidence" claim is based on something other than a "breach of confidential relationship"[6] as that phrase is typically used under Iowa law. The Iowa Supreme Court has not recognized a cause of action for "breach of confidence" at all, much less in circumstances analogous to those present here. *See Mohsen v. Veridian Credit Union*, No. C23-2048-LTS-KEM, 2024 WL 2080177, at *9 (N.D. Iowa May 9, 2024) (dismissing breach of confidence claim in data breach action). Thus, the Court GRANTS MercyOne's Motion to Dismiss Count VI.

> 5.  <u>The Court Cannot Conclude that Shine Has Altogether Failed to State a Viable Claim Under Iowa Law for Negligence or Negligence Per Se, Although the Economic Loss Doctrine Unquestionably Applies to These Claims and Leaves, at Most, Only a Narrow Window of Recoverable Damages.</u>

In the absence of a fiduciary or confidential relationship relating to the protection of confidential information, Shine is left with claims for negligence and negligence per se. Under Iowa law, a plaintiff in a negligence case must establish "the existence of a duty to conform to a standard of conduct to protect others, a failure to conform to that standard, proximate cause, and damages." *DeSousa v. Iowa Realty Co.*, 975 N.W.2d 416, 420 (Iowa 2022). Shine alleges that MercyOne owed a duty to exercise reasonable care in protecting his Private Information but breached that duty by failing to take reasonable measures to prevent the data breach and/or give prompt notice of the breach when it happened. (ECF 32, ¶¶ 189, 195–98.)

Additionally, Shine relies on certain provisions of HIPAA and Section 5 of the FTCA to assert a claim for negligence per se. (Id., ¶¶ 210–16.) Negligent conduct is actionable as negligence per se when a statute or regulation "provides a rule of conduct specifically designed for the safety and protection of a certain class of persons, and a person within that class receives injuries as a proximate result of a violation of the statute or regulation." *Wiersgalla v. Garrett*, 486 N.W.2d 290, 292 (Iowa 1992). To be actionable as such, "the harm for which the action is brought must be of the kind which the statute was intended to prevent; and the person injured, in order to recover, must be within the class which the statute was intended to protect." *Id.* (cleaned up). When that is

---

[6] It's not clear from the Consolidated Complaint what form of "breach of confidence" claim Shine is pursuing. On one hand, he describes it as a "special, fiduciary relationship" in the vein of Iowa's confidential relationship case law. (ECF 32, ¶ 272.) As noted above, however, Shine's relationship with MercyOne is nothing like the "confidential relationships" recognized under Iowa law, and his resistance to MercyOne's motion to dismiss focused entirely on breach of fiduciary duty. (ECF 38, p. 25.)

established, "there is in effect a presumption that the defendant has violated his legal duty to exercise due care." *Id*. at 293.

MercyOne argues that it had no duty to protect Shine's private information. "A legal duty is defined by the relationship between individuals; it is a legal obligation imposed upon one individual for the benefit of another person or particularized class of persons." *J.A.H. ex re. R.M.H. v. Wadle & Assocs., P.C.*, 589 N.W.2d 256, 258 (Iowa 1999). "Whether, under a given set of facts, such a duty exists is a question of law." *Leonard v. State*, 491 N.W.2d 508, 509 (Iowa 1992). The Iowa Supreme Court appears never to have decided whether a hospital or health care provider owes a duty to protect a patient's confidential information. In a recent case, however, the United States District Court for the Northern District of Iowa (Strand, J.) held "that the Iowa Supreme Court would conclude that a party collecting private data from its customers has a duty to take reasonable measures to safeguard that data." *Mohsen*, 2024 WL 2080177, at *4.

This Court agrees with Judge Strand and concludes that the Iowa Supreme Court would impose a duty on a hospital to use reasonable care to protect a patient's confidential information. The Iowa Supreme Court considers two factors in deciding whether a duty exists: "(1) the relationship between the parties and (2) public policy." *DeSousa*, 975 N.W.2d at 420. Here, the hospital-patient relationship necessarily involves the sharing of confidential personal information, including private health information, and thus is the type of relationship that supports the existence of a duty. *See, e.g.*, *Head*, 331 N.W.2d at 876. Moreover, given the sensitivity of such information, public policy supports requiring the hospital to take reasonable measures to protect it. *See id.* (explaining that patients have a "valuable right of privacy"). It follows that the Iowa Supreme Court would impose a duty in tort on the hospital to use reasonable care to protect private information. *See, e.g.*, *Brush v. Miami Beach Healthcare Grp. Ltd.*, 238 F. Supp. 3d 1359, 1365 (S.D. Fla. 2017) ("It is well-established that entities that collect sensitive, private data from consumers and store that data on their networks have a duty to protect that information.").

In arguing otherwise, MercyOne relies on *In re Supervalu II*, which predicted that the Illinois Supreme Court would conclude there is no duty under Illinois law to safeguard sensitive personal information. 925 F.3d at 963. *In re Supervalu II* reached this conclusion based in substantial part on an Illinois Appellate Court decision, *Cooney v. Chicago Public Schools*, 943 N.E.2d 23, 28–29 (Ill. App. Ct. 2010). It appears, however, that *Cooney* is no longer good law. *See Flores v Aon Corp.*, --- N.E.3d ----, 2023 WL 6333957, at *4 (Ill. App. Ct. Sept. 29, 2023) ("Given

that the legislature has now created a duty to maintain reasonable security measures under the Information Protection Act, the reasoning of the *Cooney* court no longer applies."). For this reason, and because this case arises under Iowa law anyway, *In re Supervalu II* is not governing.

Having concluded that MercyOne owes him a duty in tort, the Court next must decide whether Shine has identified a cognizable injury under Iowa law. The Consolidated Complaint identifies emotional distress as one such injury. MercyOne points out, however, that the Iowa Supreme Court has generally "refused to recognize an independent claim for emotional distress based on negligence without some physical harm." *Clark v. Est. of Rice ex rel. Rice*, 653 N.W.2d 166, 170 (Iowa 2002). The only exception of potential relevance here is "where the nature of the relationship between the parties is such that there arises a duty to exercise ordinary care to avoid causing emotional harm." *Overturff v. Raddatz Funeral Servs., Inc.*, 757 N.W.2d 241, 245 (Iowa 2008). This exception arises in deeply emotional situations like when medical professionals "negligently inflicted emotional distress based upon medical malpractice involving the treatment by a physician of a pregnant woman and her premature fetus," *Clark*, 653 N.W.2d at 171, or when a telegram company negligently delayed the delivery of a message informing the plaintiff of his mother's death, *Mentzer v. W.U. Tel. Co.*, 62 N.W.1, 6 (Iowa 1895). The Iowa Supreme Court also allows the recovery of emotional distress damages in attorney malpractice cases, albeit only when the plaintiff proves "by a preponderance of clear, convincing, and satisfactory evidence that the criminal defense attorney acted with willful and wanton disregard for the client's rights or safety." *Clark v. State*, --- N.W.3d ----, 2024 WL 2868936, at *10 (Iowa June 7, 2024).

There is nothing in these cases to suggest the Iowa Supreme Court would treat MercyOne's alleged negligence in protecting Shine's confidential information as an exception to the general rule that emotional distress damages are not recoverable in the absence of physical harm. To the contrary, any "emotional distress" Shine might have experienced from being one of thousands of people whose personal information was exposed in a data breach is nothing like the anguish a mother would feel from a nurse mistakenly identifying her child as stillborn, *see Oswald v. LeGrand*, 453 N.W.2d 634, 639 (Iowa 1990), or that a client would experience from having been incarcerated for six years based on an attorney's alleged malpractice, *see Clark*, 2024 WL 2868936, at 11. The Court therefore concludes that Shine cannot recover emotional distress damages on his negligence and negligence per se claims.

With emotional distress damages off the table, the question turns to whether Shine has identified any other viable form of injury. MercyOne relies on the economic loss doctrine to argue that he has not. "[T]he economic loss rule bars recovery in negligence when the plaintiff has suffered only economic loss." *St. Malachy Roman Cath. Congregation of Geneseo v. Ingram*, 841 N.W.2d 338, 351 (Iowa 2013); *see also Annett Holdings, Inc. v. Kum & Go, L.C.*, 801 N.W.2d 499, 503 (Iowa 2011) (explaining that "economic loss" is that "unrelated to injury to the person or the property of the plaintiff" (quoting Peter Benson, *The Problem with Pure Economic Loss*, 60 S.C. L. Rᴇᴠ. 823, 823 (2009))). "The rationale for this limitation on recovery is that purely economic losses usually result from the breach of a contract and should ordinarily be compensable in contract actions, not tort actions." *Van Sickle Const. Co. v. Wachovia Com. Mortg., Inc.*, 783 N.W.2d 684, 693 (Iowa 2010) (cleaned up). The rule has exceptions for principal-agent relationships, professional negligence, negligent misrepresentation, certain situations involving sudden danger, and fraud. *See Annett Holdings, Inc.*, 801 N.W.2d at 504; *see also Soy, Inc. v. Wells Fargo Bank, N.A.*, 636 F. Supp. 3d 970, 979 (S.D. Iowa 2022) (gathering cases).

When determining whether the economic loss doctrine applies, courts "look to the policies behind tort law and contract law to determine whether a loss is compensable in tort or in contract." *Van Sickle Const. Co.*, 783 N.W.2d at 693. The doctrine is, however, "by no means limited to the situation where the plaintiff and the defendant are in direct contractual privity." *Annett Holdings*, 801 N.W.2d at 504. Instead, whenever someone's *injuries* are contractual in nature, the person cannot recover in tort. *See Nelson v. Todd's Ltd.*, 426 N.W.2d 120, 125 (Iowa 1988) (applying doctrine where loss related to "disappointed expectations"); *see also Determan v. Johnson*, 613 N.W.2d 259, 263 (Iowa 2000) (concluding that a homebuyer's claims against the seller for shoddy construction were based on "unfulfilled expectations" and thus sounded in contract, not tort). The Iowa Supreme Court has identified several factors for determining if the economic loss doctrine applies, including "the nature of the defect, the type of risk, and the manner in which the injury arose as well as the type of damages that the plaintiff seeks to recover." *Annett Holdings, Inc.*, 801 N.W.2d at 506 (cleaned up). Those factors may be less relevant in cases "resulting only in financial harm," but the Iowa Supreme Court has nevertheless applied them to reinforce that, in such cases, the doctrine likely will apply. *See id.* (barring tort claim under economic loss doctrine because "[t]here was no risk of physical harm; there was no 'defect'; and the 'injury' (loss of money) occurred gradually and over a long period of time").

Although *Annett Holdings, Inc. v. Kum & Go, L.C.* did not involve a data breach like the one at issue here, the Iowa Supreme Court's analysis inescapably leads to the conclusion that it would apply the economic loss doctrine to the relationship between Plaintiffs and MercyOne. In *Annett Holdings*, a trucking company had a contract with a credit card supplier in which the trucking company agreed to be responsible for fraudulent use of the credit cards. *Id*. at 501. The credit card company, in turn, had a contract with Kum & Go convenience stores to handle certain types of financial transactions. *Id.* When a trucking company employee fraudulently used the credit cards at Kum & Go to embezzle cash, the trucking company attempted to sue Kum & Go for negligence and breach of contract for failing to discover and prevent the fraud. *Id.* at 502. The Iowa Supreme Court held that the trucking company's negligence claims were barred by the economic loss doctrine in light of the chain of contracts between the company, credit card supplier, and Kum & Go. *Id.* at 505. The Iowa Supreme Court explained that the trucking company "contracted to assume certain risks of financial loss" and should not be able to use tort law to circumvent the limitations on its contractual rights. *Id.* ("It is difficult to see why a tort remedy is needed here.").

Importantly, *Annett Holdings* approvingly cited and discussed five cases in which courts applied the economic loss doctrine or similar principles to claims arising out of a data breach or the misuse of confidential information:

> We are unaware of a parallel to this claim in our reported case law, but other appellate courts have recently addressed and rejected similar claims. In *Cumis Insurance Society, Inc. v. BJ's Wholesale Club, Inc.,* 455 Mass. 458, 918 N.E.2d 36 (2009), the Massachusetts Supreme Judicial Court considered claims brought by credit unions and their insurer against a retailer (BJ's) that had improperly stored credit card data in a manner that allowed thieves to access the data, resulting in fraudulent use of the credit cards. The credit unions and their insurer had to absorb the losses from the fraudulent use, so they sued BJ's, alleging that its negligence and its failure to follow the express terms of its own agreement with its merchant bank had enabled this criminal activity. *Cumis,* 918 N.E.2d at 39–40. The court found the economic loss rule barred the negligence claims, rejecting the plaintiffs' attempt to overcome that rule by arguing that tangible personal property damage (in addition to economic loss) was involved because the compromised credit cards had to be replaced and reissued. *Id.* at 46–47; *accord Sovereign Bank v. BJ's Wholesale Club, Inc.,* 533 F.3d 162, 176–77, 179–80 (3d Cir. 2008) (reaching the same result in a case

filed against BJ's under Pennsylvania law); *see also Azur v. Chase Bank, USA, Nat'l Ass'n,* 601 F.3d 212, 213–14 (3d Cir. 2010) (holding that Pennsylvania law barred a credit card account holder from suing a bank for negligently allowing the holder's personal assistant to misappropriate over $1 million through fraudulent transactions); *In re TJX Cos. Retail Sec. Breach Litig.,* 564 F.3d 489, 498–99 (1st Cir. 2009) (applying Massachusetts law); *Huggins v. Citibank, N.A.,* 355 S.C. 329, 585 S.E.2d 275, 276–77 (2003) (holding an individual could not bring a negligence claim against credit card issuer for negligently issuing a card to a person who had stolen the individual's identity).

*Id.* at 502–03. Two of these cases involved claims by consumers against retail or financial institutions for failing to protect their personal information and thus are particularly analogous to Shine's claims here. *See Azur*, 601 F.3d at 223–24 (applying economic loss doctrine even though consumer had no contractual remedy against issuer for fraudulent use of credit card); *Huggins*, 585 S.E.2d at 276–77 (holding that credit card issuer owed no duty to potential victim of identity theft). In addition, in a footnote, the Iowa Supreme Court criticized a District of Maine decision allowing negligence claims to proceed against a retail store for failing to protect private information, explaining that this outcome was "inconsistent with Iowa law." *Annett Holdings*, 801 N.W.2d at 503 n.1 (discussing *In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*, 613 F. Supp. 2d 108, 126–28 (D. Me. 2009)). Based on *Annett Holdings*, the Court concludes that, if faced with the question directly, the Iowa Supreme Court would apply the economic loss doctrine to foreclose Shine from recovering in tort for purely economic losses. Indeed, at least three courts applying Iowa law have held the same. *Mohsen*, 2024 WL 2080177, at *7 (economic loss doctrine barred negligence claim against credit union); *Fox v. Iowa Health Sys*., 399 F. Supp. 3d 780, 794–95 (W.D. Wis. 2019) (same, against hospital); *In re Target Corp. Data Sec. Breach Litig*., 66 F. Supp. 3d 1154, 1174 (D. Minn. 2014) (same, against store).

One issue remains. Even though the economic loss doctrine applies, Shine claims he has identified non-economic forms of injury that are nonetheless recoverable, including "diminution in the value of his Private Information," "loss of privacy," and time spent self-monitoring his accounts and credit reports. (ECF 32, ¶¶ 167, 172–73.) *See Am. Fire & Cas. Co. v. Ford Motor Co.*, 588 N.W.2d 437, 439 (Iowa 1999) (explaining that the economic loss doctrine prohibits recovery in tort only as to "purely economic losses"). MercyOne's briefs do not address these forms of injury except to argue that they do not give Shine or any other Plaintiff standing. (E.g., ECF 33-1, pp. 12–14; ECF 43.) As the Court has concluded for other reasons that Shine has

standing, and as MercyOne's briefs do not otherwise discuss whether these forms of injury are viable under Iowa law for purposes of Fed. R. Civ. P. 12(b)(6), the Court is left to assume without deciding that they are viable. It follows that the Court will GRANT IN PART and DENY IN PART MercyOne's motion to dismiss as it relates to Shine's claims for negligence (Count I) and negligence per se (Count II). Those claims will be allowed to proceed on the narrow issue of whether Shine can recover damages in the form of diminution in value of his personal information, loss of privacy, and loss of time. In all other respects—including, especially, his claim for emotional distress damages—those claims fail as a matter of law.

The parties should not read too much into the Court's denial of the motion to dismiss as to diminution in value, loss of privacy, and loss of time. The Court is not concluding that such forms of injury are (or are not) cognizable in negligence claims under Iowa law. Instead, the Court is simply concluding that it would be inappropriate to address the merits of an issue that has not been adequately raised. *See, e.g.*, *Sandahl Farms v. Farm Serv. Agency of U.S. Dep't of Agric.*, No. 4:17CV3122, 2018 WL 9945201, at *20 (D. Neb. Aug. 21, 2018) (refusing to interpret party's Fed. R. Civ. P. 12(b)(6) motion beyond what the party expressly argued). Accordingly, the parties are free to address the issue of the recoverability of these damages in future motion practice.

## IV. CONCLUSION.

The Court GRANTS IN PART and DENIES IN PART MercyOne's Motion to Dismiss (ECF 33). Plaintiff Shine's claims for negligence and negligence per se will be allowed to move forward as it relates to his alleged damages in the form of diminution in value of his personal information, loss of privacy, and loss of time. In all other respects, Plaintiffs' claims fail as a matter of law and are dismissed without prejudice.

IT IS SO ORDERED.

Dated: June 26, 2024

_____
STEPHEN H. LOCHER
U.S. DISTRICT JUDGE